IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 1:16-cr-163 |
| v. | ) | |
| | ) | |
| MOHAMED BAILOR JALLOH, | ) | |
| | ) | |
| Defendant. | | |

## STATEMENT OF FACTS

The United States and the defendant, MOHAMED BAILOR JALLOH, agree that the United States would have proven at trial the following facts beyond a reasonable doubt with admissible and credible evidence.

1. Beginning in or about June 2015, and continuing thereafter until July 3, 2016, within Loudoun County Virginia in the Eastern District of Virginia and elsewhere, including locations outside of the United States, defendant MOHAMED BAILOR JALLOH did unlawfully and knowingly attempt to provide "material support or resources," as that term is defined in Title 18, United States Code, Section 2339A(b), to wit, personnel to the Islamic State of Iraq and the Levant ("ISIL"), the service of attempting to procure a weapon which he believed would be used in an ISIL directed attack on U.S. soil, and money to support ISIL, which at all relevant times was designated by the Secretary of State as a foreign terrorist organization pursuant to Section 219 of the Immigration and Nationality Act, knowing that ISIL was a designated foreign terrorist organization, that ISIL engages and has engaged in terrorist activity, and that ISIL engages and has engaged in terrorism.

2. On October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq (AQI), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224.

3. On May 15, 2014, the Secretary of State amended the designation of al-Qaeda in Iraq as an Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias "Islamic State of Iraq and the Levant" as its primary name. The Secretary also added the following aliases for ISIL: the Islamic State of Iraq and al-Sham, the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. ISIL has remained continuously designated since the first designation of AQI in 2004.

4. In an audio recording publically released on June 29, 2014, ISIL announced a formal change of ISIL's name to Islamic State. On or about September 21, 2014, ISIL spokesman Abu Muhammad al-Adnani called for attacks against citizens – military or civilian – of the countries participating in the United States-led Coalition against ISIL.

5. The defendant, MOHAMED BAILOR JALLOH, is a naturalized United States citizen who was born in Sierra Leone in 1989. JALLOH traveled back to Sierra Leone on June 11, 2015, and returned to the United States on January 16, 2016.

6. Upon his arrival in Sierra Leone, JALLOH came in on-line contact with Un-named co-conspirator 2 (UCC2), a prominent on-line ISIL supporter who openly offered assistance to those wanting to join ISIL in Libya. In order to assist JALLOH in joining ISIL in Libya, UCC2 put him in contact with a known ISIL facilitator operating in Africa. The known

ISIL facilitator sent recruits to join ISIL in Libya by providing contacts and transportation that would help to get them there.

7. In or around August 2015, JALLOH and the known ISIL facilitator met in person in Nigeria. JALLOH planned to travel to join ISIL with the known ISIL facilitator's assistance. JALLOH and the known ISIL facilitator stayed together for approximately two weeks while JALLOH was waiting to be taken to join ISIL in Libya. During this time, there were delays in getting individuals to join ISIL in Libya, and JALLOH left the known ISIL facilitator to go visit a family friend.

8. In or around September 2015, the known ISIL facilitator was in Niger attempting to facilitate a second group of individuals who wanted to join ISIL in Libya. JALLOH was able to re-connect with the known ISIL facilitator at that point.

9. JALLOH decided to join the known ISIL facilitator and attempt to join ISIL. During this attempt to join ISIL in Libya in September 2015, JALLOH boarded a truck that would carry him and other individuals to Libya. The truck was preparing to depart Niger for a journey through the Sahara Desert to southern Libya. From southern Libya, the group would be transported by ISIL members to an ISIL-controlled area in Libya. The known ISIL facilitator would not accompany JALLOH or the other travelers the rest of the way. However, before they separated, JALLOH gave the known ISIL facilitator approximately $100 to help the known ISIL facilitator get back to Nigeria.

10. In or around November 2015, JALLOH and the known ISIL facilitator reconnected via mobile messaging applications. JALLOH informed the known ISIL facilitator that he had abandoned the truck that he had boarded in September because he decided he was not ready to fight for ISIL.

11. In or around December 2015, the known ISIL facilitator explained to JALLOH that a group of individuals whom the known ISIL facilitator was helping to transport to join ISIL in Libya were stuck at a transit point. The group was waiting for ISIL to send money to get them to ISIL- controlled territory.

12. In or around January 2016, while JALLOH was located in Sierra Leone, JALLOH sent the known ISIL facilitator Nigerian currency worth approximately $341.04 to help transport the group of prospective ISIL recruits to ISIL-controlled territory. The known ISIL facilitator was successfully able to get JALLOH's money, and the known ISIL facilitator confirmed that these individuals successfully arrived in ISIL-controlled areas of Libya and joined ISIL. JALLOH left Sierra Leone and returned to the United States in January 2016.

13. Prior to his departure from Sierra Leone, JALLOH came in on-line contact with Abu Saad Sudani. JALLOH understood that Sudani was an ISIL figure who was engaged in plotting an attack in the United States. Over the course of the next several months, Sudani and JALLOH communicated on-line about JALLOH's sending money to Sudani to support ISIL. In or about the spring of 2016, JALLOH sent money to Sudani to support ISIL on two occasions. In order to conceal these transactions, JALLOH used a family member in Sierra Leone to transfer the money to an associate of Sudani's living overseas. Utilizing this method, JALLOH transferred $250 on or about March 18, 2016, and $450.63 on or about April 12, 2016, to Sudani's ISIL contact living overseas.

14. In March 2016, Sudani brokered an on-line introduction between JALLOH and an individual located in the United States, confidential Human Source 1 (CHS1). At this time, Sudani was actively plotting an attack in the United States which Sudani hoped would be carried out with the assistance of both CHS1 and JALLOH.

15. On or about March 27, 2016, Sudani told CHS1 to contact JALLOH, and he encouraged them to meet in person. At that point CHS1 and JALLOH began communicating in order to coordinate an in-person meeting.

16. On or about April 9, 2016, CHS1 and JALLOH met in person in Sterling, Virginia, near where JALLOH was residing. During this meeting, JALLOH told CHS1 that he had listened to a lot of lectures, including those by "Shaykh Anwar," a reference to now-deceased Al-Qaeda in the Arabian Peninsula leader Anwar al-Awlaki (Awlaki).[1] JALLOH is a former member of the United States Army National Guard, but he told CHS 1 that he decided not to re-enlist in the National Guard after listening to Awlaki lectures on-line. JALLOH was first introduced to Awlaki's lectures after hearing CNN refer to Awlaki as a "hate preacher." This prompted JALLOH to research Awlaki online where he discovered Awlaki's lectures. JALLOH explained that Awlaki said it was a duty of every able Muslim to resist the American occupation in Iraq and Afghanistan. JALLOH told CHS1 that once the "Khilafah" was announced, "I understood this was the reality," and that listening to Awlaki lectures helped JALLOH to "understand."

17. JALLOH told CHS1 during their meeting on April 9, 2016, that Mohamed Yousef Abdulaziz, a now-deceased gunman who killed five United States military members in a terrorist attack in Chattanooga, Tennessee, in July 2015, was a "very good man."

---

[1] Anwar Al-Awlaki was an Islamic lecturer and a leader of Al-Qaeda in the Arabian Peninsula ("AQAP"), a Yemen-based designated foreign terrorist organization that has claimed responsibility for terrorist acts against targets in the United States, Saudi Arabia, Korea and Yemen since its inception in January 2009. Pursuant to a Presidential Executive Order, Al-Awlaki was designated by the United States as a "Specially Designated Global Terrorist" on July 12, 2010. Al-Awlaki was reportedly killed in Yemen in September 2011.

18. JALLOH said that he thinks about conducting an attack all the time, and that he was close to doing so at one point. JALLOH claimed to know how to shoot guns, and that he had been thinking about conducting a Nidal Hassan (Hassan) – style attack. Hassan is a former Major in the United States Army who killed 13 people and wounded 32 others in a terrorist attack on Fort Hood, Texas, in November 2009.

19. On or about April 14, 2016, CHS1 told Sudani about the meeting with JALLOH. While they were discussing possible attack operations, Sudani directed CHS1 to include JALLOH in any attack planning if JALLOH was interested.

20. On or about April 15, 2016, Sudani asked JALLOH if he wanted to "[join] the brothers for the operation."

21. On or about April 21, 2016, JALLOH confirmed to CHS1 that he had discussed attack plans with Sudani. JALLOH told CHS1 that Sudani had asked JALLOH if JALLOH wanted to participate in an attack. JALLOH informed CHS1 that he told Sudani, "I really want to but I don't want to give my word and not fulfill it."

22. On or about April 24, 2016, JALLOH told CHS1, "I just want to live a good Muslim life and die as a Shaheed [Martyr]."

23. During an in-person meeting between CHS1 and JALLOH on or about May 1, 2016, JALLOH inquired about the timeline for an operation to be directed by Sudani and involving CHS1 and possibly JALLOH. JALLOH expressed that it was better to plan an operation for Ramadan. JALLOH indicated he was working on himself to ensure his heart would be strong and not fail him at the moment when it was needed the most.

24. Also at the May 1 meeting, JALLOH asked CHS1 if CHS1 could assist JALLOH if JALLOH wanted to make a donation to ISIL. When asked to clarify, JALLOH replied, "like if you want to like support the Khilafah through you know, like wealth."

25. When discussing potential attack operations with CHS1, JALLOH reiterated that it was something he had thought about, and as a result, had even purchased a handgun. The handgun that JALLOH purchased was a Glock 19 and he had bought it in the Eastern District of Virginia on February 13, 2016.

26. JALLOH told CHS1 that conducting an operation was not supposed to be easy because it is a test, and attaining paradise or "Jannah" is also not easy. When discussing the support that JALLOH could provide if he decided not to take part in an operation himself, JALLOH offered the possibilities of providing money and/or weapons. JALLOH explained he had a family member, hereinafter referred to as North Carolina Associate (NCA), with access to weapons, specifically AR-15s and AK-47s.

27. When discussing attack operations, JALLOH stated he knows such operations are "100 percent the right thing." JALLOH then asked if CHS1 ever thought about targeted operations.

28. On or about May 11, 2016, JALLOH again asked CHS1 about donating money to ISIL. Upon being told of an individual with ISIL who could receive funds from JALLOH, JALLOH indicated he was interested in sending $500.

29. On or about May 13, 2016, CHS1 provided JALLOH with a Mobile Messaging account (hereinafter referred to as MM1) that JALLOH could use to provide funds to members of ISIL. In actuality, MM1 was controlled by FBI Employee 1, acting in an undercover capacity. FBI Employee 1 portrayed him/herself as a member of ISIL located overseas.

30. On or about May 15, 2016, CHS1 told JALLOH about a plot to murder U.S. military personnel and then conduct a follow-on martyrdom operation. CHS1 asked JALLOH what weapons JALLOH'S family member could acquire for $1,500. JALLOH asked if CHS1 wanted pistols or AK-47's and stated, "I will support you with whatever you need from me, I need the reward from Allah and my sins to be forgiven."

31. On or about May 17, 2016, JALLOH told CHS1 that he had initiated a conversation with the person posing as a member of ISIL via MM1. JALLOH requested that CHS1 inform the person he believed to be a member of ISIL (FBI Employee 1), of JALLOH's account moniker so FBI Employee 1 would know JALLOH was the person who had initiated the conversation.

32. On or about May 18, 2016, JALLOH texted NCA, and stated, "Yo what's good bro...gotta holla at you about something...Imma call you this weekend about it tho inshaAllah." NCA replied, "Say no more..." JALLOH ended the conversation by saying, "yea man I just need a price range on something and if it's Available."

33. On or about May 19, 2016, in response to CHS1's request for JALLOH's assistance in procuring weapons and CHS1's concern that NCA would alert law enforcement to CHS1 and JALLOH's interest in procuring weapons, JALLOH reassured CHS1, stating, "...Akhi I'm sure he won't be suspicious and even if he his (sic) he wouldn't report anything he has some charges himself and he wants to stay clear of the authorities."

34. On or about May 20, 2016, JALLOH indicated to CHS1 he planned to contact NCA the coming weekend to find out if NCA knew where JALLOH could buy weapons.

35. On or about May 20, 2016, JALLOH contacted FBI Employee 1 and said that he would do his best to send the money soon.

8

36. On or about May 22, 2016, JALLOH told CHS1 that NCA was working to find a weapon for JALLOH to buy. JALLOH and NCA had approximately six telephone calls with one another on that date.

37. On or about May 25, 2016, JALLOH texted NCA and stated, "Yo bro I hope you looking into that for me man I got the money ready and everything no BS." NCA replied the next day, saying, "I got u cuz I'm on it."

38. On or about June 11, 2016, JALLOH conducted an internet search on a shopping website for "glock 19 magazine 15 round."

39. Also on or about June 11, 2016, JALLOH asked FBI Employee 1 for advice on ways to send to money to FBI Employee 1. That same day, JALLOH sent FBI Employee 1 $50 worth of gift card codes intended for use by ISIL and he told FBI Employee 1 "let me know if you need more (gift cards)."

40. On or about June 13, 2016, JALLOH searched a shopping website for "ar15."

41. On or about June 15, 2016, JALLOH searched the website of a gun store in Norfolk, Virginia, for long guns, rifles, and semi-automatics.

42. On or about June 16, 2016, JALLOH told CHS1 that he was traveling to North Carolina and he planned to meet with NCA.

43. On or about June 17, 2016, JALLOH viewed an on-line news story entitled, "Buying an AR-15 gun like the one used in the Orlando massacre is easy in many states."

44. On or about June 18, 2016, JALLOH conducted internet searches and visited webpages related to Omar Mateen, SIG Sauer, Semi-automatic rifle, Sig Sauer rifles, AR15, mac90, bullets for AR15, and AR15 with no butt stock. JALLOH also visited a site which

indicated Mateen utilized a Sig Sauer rifle during his June 12, 2016 terrorist attack at the Pulse Nightclub in Orlando, Florida.

45. Also on or about June 18, 2016, JALLOH, having traveled to North Carolina, spent four hours with NCA in the vicinity of Charlotte, North Carolina, driving to various locations. During the four hours when he was with NCA, JALLOH and NCA visited a residence where an individual showed them his AK-47. JALLOH asked if the individual would be willing to sell it as the AK-47 was just what JALLOH was looking for, but the individual said that he did not want to sell the gun.

46. On or about June 18, 2016, JALLOH contacted CHS1 and said that he and NCA had driven around and had seen an AK but the person did not want to sell it.

47. On or about June 19, 2016, JALLOH told CHS1 that NCA was doing his best, but the person with the weapon did not want to sell it. JALLOH also told CHS1 to be patient and he would get him something nice.

48. Also on or about June 19, 2016, JALLOH conducted an internet search for a gun store in the Eastern District of Virginia (hereinafter referred to as Local Gun Store).

49. On or about June 20, 2016, JALLOH contacted FBI Employee 1 via MM1 to obtain the information required to send money to ISIL. Using that information, JALLOH transferred $500 intended for use by ISIL to the person whom he believed was a member of ISIL.

50. On or about June 25, 2016, JALLOH contacted CHS1 and said that he needed to find time to go down to North Carolina again to meet with NCA in order to try to get a gun.

51. On or about July 1, 2016, JALLOH searched the internet for Local Gun Store, visited Local Gun Store's website, and visited websites for ammunition and specific rifles, to include a rifle equipped with slide fire and bump stock technology.

52. Also on or about July 1, 2016, JALLOH attempted to purchase an AR-15 at Local Gun Store, but he was turned away because he did not have the proper identification.

53. On or about July 2, 2016, JALLOH conducted internet searches for a specific type of firearm laser sight, then visited the product's website. JALLOH conducted internet searches for "Orlando shooting weapon," then visited numerous news stories related to the weapon (AR-15) used by the Orlando shooter. JALLOH conducted internet searches for "223 caliber," and "223 caliber is it effective." JALLOH then visited web pages titled, "Marine: 223 May Not Be Lethal Enough for Civilians – The Truth About Guns," and "Is 223 the Best home Defense Caliber." JALLOH conducted searches and visited web pages related to a specific AR-15 and prices.

54. Also on or about July 2, 2016, JALLOH purchased a Stag Arms AR-15 from Local Gun Store. He was arrested on a criminal complaint the following morning.

55. This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

56. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reasons.

Respectfully submitted,

Dana J. Boente
United States Attorney

By: _____
John T. Gibbs
Assistant United States Attorney

Brandon L. Van Grack
Special Assistant United States Attorney

Jolie F. Zimmerman
Trial Attorney, Counterterrorism Section
National Security Division
United States Department of Justice

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, MOHAMED BAILOR JALLOH, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Mohamed Bailor Jalloh
Defendant

I represent MOHAMED BAILOR JALLOH. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Joseph T. Flood
Attorney for MOHAMMED BAILOR JALLOH