# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CRIMINAL NO. 1:16-cr-296 (LO)** |
| **MOHAMED BAILOR JALLOH,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

**COMES NOW** the Defendant Mohamed Bailor Jalloh, by counsel and, in accordance with 18 U.S.C. § 3553(a) and § 6A1.2 of the United States Sentencing Guidelines ("USSG"), respectfully submits this memorandum in aid of sentencing. Based on a consideration of the Sentencing Guidelines as well as the factors set forth in § 3553(a), particularly Mr. Jalloh's shallow commitment to extremist ideology, his background and history, his extraordinary acceptance of responsibility, his significant and continued cooperation with law enforcement authorities, his low risk of recidivism, and because the guidelines dramatically overstate his criminal history category and likelihood to re-offend, a downward departure and variance are both warranted. A sentence of 78 months constitutes an appropriate punishment in this case.

## I.    PRESENTENCE INVESTIGATION REPORT AND GUIDELINE CALCULATIONS.

### A.    Corrections to the PSI and Sentencing Guidelines Calculation.

Mr. Jalloh pleaded guilty on October 27, 2016, to one count of providing material support to a terrorist organization in violation of 18 U.S.C. § 2339B. Undersigned counsel has consulted with United States Probation Officer as part of his presentence investigation. After reviewing the Presentence Investigation Report ("PSR"), undersigned counsel filed written objections, most of

which were unopposed, on January 23, 2017. The Probation Office made all but two of the requested changes, leaving two errors that require correction. First, in paragraph 44, the PSR asserts that "[r]ecords … reveal[] the defendant was terminated for violation of company policies." (Doc. 47, at 18.) Mr. Jalloh was terminated at his last employment, G4S Security, due to his arrest for the current offense and not returning to work. At the time of his arrest he was an employee in good standing with no history of violating company policies. In fact, he had recently been promoted to supervisor. Undersigned counsel issued a subpoena *duces tecum* for Mr. Jalloh's complete employment file from G4S and received 174 pages of documents in response. These records, which are available upon request, contain no reference to a violation of any company policy, much less that reason being the basis for termination. Because Mr. Jalloh is unaware of any records supporting the contention he was terminated for violating company policy, and the Probation Office has not provided those records to counsel, Mr. Jalloh requests that this sentence be stricken from the PSR.

Mr. Jalloh also objects to the application of a two-point enhancement under USSG § 2M5.3(B)(1)(E), (Doc. 44, at 13), because such an increase is appropriate only where a defendant provided funds to a terrorist organization "with the intent, knowledge or reason to believe they are to be *used to commit or assist in the commission of a violent act*." (Emphasis added.) In Mr. Jalloh's case there is no evidence to support the heightened knowledge requirement required by § 2M5.3(B)(1)(E), and he denies he intended or had reason to know that the donations he made would be used for violent purposes. The statement of facts entered into by the parties identifies several payments comprising his financial support for ISIL. Two of these remittances – a payment of $100 in September, 2015, and a payment of $341.04 in January, 2016 – were made to help defray transportation costs. (Doc. 37, at 4.) The other payments - $250 on or about March

18, 2016, and $450.63 on or about April 12, 2016 – were intended to help pay for living expenses and computer equipment. *Id.* In neither instance did Mr. Jalloh discuss committing violent acts, much less a specific act or operation, or providing funds for the purchase of weapons or inherently violent instruments. *See United States v. Nayyar*, 2013 U.S. Dist. LEXIS 79002, *15 (S.D.N.Y. 2013) (conspiracy "to sell firearms and ammunition to Hizballah knowing they would be used in furtherance of violence"); *United States v. Are*, 2007 U.S. Dist. LEXIS 17926, *3-4 (N.D. N.Y. 2007) (moneys provided for express purpose to illegally import surface-to-air missile for use in attack on Pakistani Ambassador in New York City). As such, this guideline enhancement is inapplicable.

Based on the application of the § 2M5.3(B)(1)(E)[1], the PSR guideline calculation erroneously increases Mr. Jalloh's Adjusted Offense Level by two levels – raising it from 38 to 40. Mr. Jalloh does agree that, as set forth in the PSR, his starting Criminal History Category must be raised from I to VI, pursuant to under § 4A1.3, and that he is entitled to a three level downward departure for acceptance of responsibility.[2] Based on these adjustments, Mr. Jalloh submits that his final offense level should be 35. In either case, because the maximum term of incarceration for this single conviction is 240 months, that becomes the starting "advisory guideline sentence". *United States v. Warsame*, 651 F.Supp.2d 978, 981 (D. Minn. 2009); USSG §5G1.1(a).

## B.    Downward Departure under USSG § 4A1.3.

Mr. Jalloh's guideline sentence dramatically, misleadingly, and unfairly overstates his

---

[1] Pursuant to his plea agreement, Mr. Jalloh stipulated to the twelve-level increase for the Victim Related Adjustment for Terrorism under USSG § 3A1.4 (a). (Doc. 38, at 3.)

[2] Mr. Jalloh's acceptance of responsibility has been truly extraordinary because of its speed, sincerity, and certainty of purpose, as evidenced by the fact that he promptly admitted his crime upon his arrest and began cooperating with law enforcement authorities without counsel, continued to cooperate and debrief through the present, waived his rights to a preliminary hearing and bond, and admitted his guilt at the first opportunity.

3

career criminal category to a staggering degree. Prior to the actions that resulted in the criminal charge in this case, Mr. Jalloh had never been arrested or even accused of committing a crime. According to every witnesses interviewed, Mr. Jalloh has always been a respectful, peaceful, and responsible person prior to his flirtation with the Islamic State ("ISIL"). Mr. Jalloh's illegal activity was discovered by law enforcement when he was introduced to a confidential informant ("CI") by a known ISIL operative. Importantly, Mr. Jalloh initiated this introduction for the express purpose of trying to meet a Muslim woman to marry. After Mr. Jalloh began the communication, the CI requested his assistance in an "operation" on American soil and Mr. Jalloh responded first with ambivalence, but quickly refused the invitation to participate. In the ensuing months, and through text messages, phone calls, and two in-person meetings, in which the CI shaped and influenced his views, Mr. Jalloh agreed to make efforts to secure a weapon, but continued to decline to participate in any kind of "operation." Upon his arrest, Mr. Jalloh immediately began cooperating in the criminal investigation without any promised benefit, including admitting to additional criminal activity – i.e., sending funds and traveling to Niger. Subsequently, at the earliest moment possible, Mr. Jalloh pleaded guilty to his crime and agreed to assist the United States in its investigation. As a result of his pre-indictment guilty plea, acceptance of responsibility, admission of guilt, renunciation of ISIL, and ongoing cooperation, he has spared the United States significant expense and resources (Doc. 38, at 3-4), and represents an extremely low risk to re-offend. He has also provided information to multiple law enforcement agencies investigating criminal activity in the United States and abroad.

"If reliable information indicates that a defendant's criminal history category substantially over-represents the seriousness of the defendant's actual criminal history or the likelihood that the defendant will commit other crimes," a court has discretion to depart

downward. USSG § 4A1.3(b); *United States v. Moreland,* 437 F.3d, 424, 432 (4th Cir. 2006). In

*United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003), the court made clear the broad discretion

to depart downward extends in cases involving the terrorism enhancement: "A judge determining

that § 3A1.4(b) over-represents the seriousness of defendant's past criminal conduct or the

likelihood that defendant will commit other crimes always has the discretion under § 4A1.3 to

depart downward at sentencing." Indeed, departures are "encouraged" where the applicable

criminal history category fails to accurately reflect a defendant's true criminal history or the

likelihood he will commit other crimes. *United States v. Dixon*, 318 F.3d 585, 588 (4th Cir.

2003).

In *United States v. Benkahla*, 501 F.Supp.2d 748 (E.D. Va. 2007), a jury convicted the

defendant of two counts of making false declarations to a grand jury, obstruction of justice, and

making false statements to an FBI agent. The prosecution arose from the defendant's repeated

denials – including in front of two grand juries - of having traveled to Pakistan and possibly

Afghanistan to participate in terrorism training including handling and discharging firearms or

explosive devices to prepare for violent jihad. *Id.* at 750-51. At sentencing, the trial court applied

§ 3A1.4 to increase Benkahla's offense level from 20 to 32, and his guideline range to 210-262

months. *Id.* at 757.

After determining § 4A1.3 allowed for a downward departure, the *Benkahla* court

addressed the disproportionate effect § 3A1.4 had on the defendant's criminal history category:

"For an individual with no criminal record and no evidence of ever having committed an illegal

act in his life outside the conduct for which he is convicted, this clearly over-represents the

seriousness of his criminal history." 501 F.Supp.2d at 759. As to the second factor, the court

found that increasing Benkahla's criminal history category to VI also over-represented the

likelihood he would commit other crimes, noting Benkahla was not a terrorist and did not share the characteristics or conduct of a terrorist, and therefore, lacked "the same likelihood of recidivism, the difficulty of recedivism, or the need for incapacitation." *Id.* Consequently, because Benkahla had no criminal record and had otherwise been a model citizen, the court determined "his likelihood of ever committing another crime is infinitesimal", making him "the quintessential candidate for a downward departure under § 4A1.3." *Id.* Describing the disparity created by § 3A1.4 as "staggering", the court reduced Benkahla's suggested guideline range from a category VI to a category I, and his sentencing range from 210-262 months to 121-151 months, and imposed a sentence of 121 months. *Id.*

In *United States v. Aref*, 2007 U.S. Dist. LEXIS 17926, *3 (N.D.N.Y. 2007), the defendant was convicted of twenty-seven crimes, including one count of conspiracy to provide material support to a terrorist organization, and seven counts of attempting to provide material support to a terrorist organization, all in violation of 18 U.S.C. § 2339B. These convictions arose from a protracted conspiracy to fund terrorist organizations overseas and to import surface to air missiles into the United States for the purpose of carrying out domestic terrorism. *United States v. Aref*, 2007 U.S. Dist. LEXIS 12228, at *6-11 (N.D.N.Y. 2007). Despite the elaborate nature of the conspiracy, the large number of convictions, the extensive planning involved to carry out the crimes, and its domestic aims, the court determined "that a criminal history category of VI does substantially over-represent the seriousness of [the defendant's] criminal history." *Id.* at *7.

> As indicated in the PSR at paragraphs 82 through 87, Hossain received zero total criminal history points as scored by the United States Probation Department. The credible and reliable evidence indicates that Hossain has provided for his family until his arrest through lawful employment and various capacities, and there is no indication that he has engaged in any other criminal activity in this country other than reported.

*Id.* at *8. Due to the defendant's lack of a criminal history and his personal characteristics, the

court found "his circumstances to be extraordinary and that a downward departure is warranted to a criminal history category of I." *Id.* Because the court also exercised its discretion to run the sentences for all of the defendant's convictions concurrently, his sentence was effectively reduced from life imprisonment to fifteen years. *Id.* at *22.

More recently, in *United States v. Farrokh,* 1:16-cr-20 (E.D.Va. 2016), a case involving an American-born citizen arrested at the Richmond International Airport attempting to board an airplane and travel to Syria to join ISIL, Judge Trenga granted a substantial downward departure after concluding "that a Criminal History Category VI does over represent the defendant's criminal history …." *United States v. Farrokh,* 1:16-cr-20, Doc. 48, at 1. Farrokh had two prior misdemeanor convictions and, but for the application of § 4A1.3, his Criminal History Category would have been II. The reduction of Farrokh's Criminal History Category from VI to II, reduced his guideline range from 292 365 months to 188 to 235 months. After applying the factors set forth in 18 U.S.C. § 3553, Judge Trenga imposed a sentence of 102 months.

Because compelling evidence shows Mr. Jalloh's (1) criminal history category substantially over-represents the seriousness of his criminal history, and (2) criminal history category substantially over-represents the likelihood he will reoffend, a substantial downward departure is warranted.

> ### 1. Applying § 3A1.4(b) substantially over-represents the seriousness of Mr. Jalloh's past criminal conduct.

Increasing Mr. Jalloh's Criminal History Category to VI dramatically and unfairly over-represents the seriousness of his criminal history. The current offense is a complete aberration because Mr. Jalloh is not a violent person and prior to this offense had never even been accused of a crime. He has never used, owned, or possessed firearm illegally, and has always conducted himself in a peaceful, non-violent way. Mr. Jalloh's spotless record stands in stark contrast to

the defendants in *Benkahla* and *Aref*, both who received significant downward departures, despite their multiple convictions and despite either actually traveling abroad for terrorist training and then lying about it to grand juries, or raising substantial sums of money with the intent of aiding domestic terrorism. Similarly, in contrast to the defendant in *Farrokh* who had two prior criminal convictions, Mr. Jalloh has never ran afoul of the law. Because Mr. Jalloh's criminal history category indisputably over-represents the seriousness of his prior criminal history and the application of the § 3A1.4 would create a staggering increase in his advisory guideline sentence - approximately 522% (46-57 months vs. 240 months) - a significant downward departure is warranted under § 4A1.3.

### 2. § 3A1.4(b) substantially over-represents the likelihood that Mr. Jalloh will commit other crimes.

Applying § 3A1.4(b) also substantially and unfairly over-represents the likelihood Mr. Jalloh would re-offend, which is very low. Upon his arrest Mr. Jalloh promptly admitted his crimes and began debriefing with the United States and this cooperation has continued through the present. Much of his cooperation was provided with *no promised benefit*, which is the strongest evidence Mr. Jalloh takes full responsibility for his actions and is unlikely to reoffend. Even more, cooperating in ongoing investigations of ISIL supporters and terrorists, puts Mr. Jalloh at significant personal risk.

Critically, Mr. Jalloh has formally renounced ISIL. In his letter to this Court for sentencing, Mr. Jalloh wrote: "I feel deep regret in having been driven by my emotions rather than my intellect and becoming involved with such an evil organization… I reject and deplore terrorism and any groups associated with it, especially ISIL."[3] Renouncing ISIL and cooperating with law enforcement authorities in their pursuit of terrorists is compelling proof Mr. Jalloh has

---

[3] Mr. Jalloh's letter to the Court, dated January 31, 2017, is attached as **Exhibit A**.

rejected ISIL, its goals, and the beliefs which led him to fall under the sway of ISIL operatives and online videos. Because this denunciation parallels his continuing cooperation it reflects a sincere change rather than a convenient alteration to gain a sentencing benefit.

In sharp contrast to the defendants in *Benkahla* and *Aref* who denied their many crimes, insisted on a trials then appealed their convictions, *see United States v. Aref*, 533 F.3d 72 (2d Cir. 2008), *cert. denied*, 556 U.S. 1107 (2009); *United States v. Benkahla,* 530 F.3d 300 (4th Cir.), *cert. denied,* 555 U.S. 1120 (2009), and declined to cooperate with law enforcement, Mr. Jalloh's acceptance of responsibility goes far beyond providing assistance. Mr. Jalloh admitted his crime and pleaded guilty. He waived his right to be prosecuted on an indictment, his right to plead not guilty and have a jury trial, and his right to appeal. These actions are unequivocal proof Mr. Jalloh's extremist views were shallow and short-lived, that he has reformed and that the risk he will commit crimes in the future is virtually nil.

In *Benkala* the defendant traveled abroad to train as a terrorist, fired high powered weapons during training, and took these actions with the explicit intent to join a terrorist organization. And for lying about his actions, including to a grand jury, he was convicted and punished. Even so, the sentencing court still found he was "not a terrorist" because he did "not share the same characteristics or the conduct of a terrorist," 501 F.Supp.2d at 759, and, therefore, concluded "there is no reason to believe he would ever commit another crime after his release from imprisonment." *Id.* These conclusions and reasoning apply with even greater force to Mr. Jalloh who possesses all of the same positive qualities, and more. *See* Point II. B, *supra*, at 14-28. In contrast to Benkahla, however, Mr. Jalloh immediately admitted his crime, took full responsibility, pleaded guilty, and cooperated with ongoing investigations. If Benkahla was the "quintessential candidate for a downward departure" because of his low risk to reoffend *id.*, it

would be hard to imagine anyone less likely to to commit other crimes or more deserving of downward departure than Mr. Jalloh, including Benkahla himself.

Court-appointed risk assessment expert Gregory Saathoff, M.D.[4], determined Mr. Jalloh's general risk of recidivism is low: "[M]ost of the data tends to lower, rather than raise, concerns about Mr. Jalloh's potential for recidivistic violence in the future [and] most of the previous validated data on violence risk suggests that Mr. Jalloh is at lower risk for re-adoption of violent extremist statements and behaviors."[5] Regarding the recidivism specific to terrorism related crimes, Dr. Saathoff found "the prospect of Mr. Jalloh's recedivism in areas of terrorism-related activity are significantly decreased relative to others who might receive and plead guilty to the same charge, and his risk of recidivism for terrorism-related crimes is low … based on Mr. Jalloh's unique offender characteristics, nature of his involvement in this crime, and his accepting responsibility and willingness to provide substantial assistance to the United States.[6]

Because compelling evidence demonstrates the § 3A1.4(b) enhancement substantially over-represents the likelihood Mr. Jalloh will commit other crimes, a significant downward departure under § 4A1.3 is appropriate.

### 3. Conclusion.

Unlike Benkahla and Aref, who aggressively asserted their innocence and demanded trials and continued to fight on appeal, Mr. Jalloh promptly admitted his crime and waived his legal rights. Also unlike Benkahla and Aref, who apparently presented no forensic proof of their likelihood of recidivism, Mr. Jalloh has adduced compelling evidence he is unlikely to re-offend generally, or to commit terrorism related offenses specifically. For all these reasons, the §

---

[4] Dr. Saathoff's curriculum vitae is attached as **Exhibit B.**
[5] Forensic Psychiatric Evaluation Report of Gregory Saathoff, M.D., of January 27, 2017, at 22 (a copy of this report is attached as **Exhibit C**).
[6] *Id.* at 26.

3A1.4(b) enhancement dramatically over-represents the seriousness of his past criminal conduct and likelihood he will commit other crimes, and downward departure from category VI to category I under § 4A1.3 is warranted, resulting in a starting guideline range of 168-210 months.

## II.    NON-GUIDELINE SENTENCING CONSIDERATIONS.

After calculating the guideline range, district courts then consider the factors in 18 U.S.C. § 3553(a) to determine whether a variance from the guideline range is warranted. *Gall v. United States*, 552 U.S. 32, 42 (2007). There is no presumption of reasonableness attached to the guideline range nor a presumption of unreasonableness of a non-guideline range sentence. At the conclusion of considering the guideline range and § 3553(a) factors in relation to the facts of the case, "the court shall impose a sentence sufficient, but not greater than necessary" to comply with the purposes of § 3553(a). Consideration of these factors emphatically shows that a sentencing range of 168-210 months is far "greater than necessary" to implement the purposes of § 3553(a), and that a significant variance is warranted. Because of the truly unique circumstances of this case, Mr. Jalloh respectfully requests that the Court grant a downward variance and impose a sentence of 78 months.

### A.    Nature and Circumstances of the Offense.

Mr. Jalloh pleaded guilty to providing material support to ISIL in violation of 18 U.S.C. § 2339B. The United States and the defendant have stipulated Mr. Jalloh attempted to travel to Libya, provided a small amount of money to ISIL operatives to cover travel and living expenses, and attempted to procure a weapon for a man he believed was affiliated with ISIL. Mr. Jalloh acknowledges this is a serious offense and accepts responsibility. (Doc. 30, at 1.)

Although Mr. Jalloh takes responsibility for his crime, the allegations obscure the essential nature of his offense. Mr. Jalloh was a complete neophyte to radical extremism. His

dalliance with ISIL arose from a shallow commitment to the cause, was in keeping with his search for identity and purpose, and stemmed primarily from a personal psychological crisis. Most important, in each instance Mr. Jalloh's actions came at the behest of an older and/or more forceful Muslim men who placed an escalating set of demands on him; demands that came wrapped in Quranic truth. Mr. Jalloh was admittedly seeking direction in life as he was struggling with mounting emotional issues, and, while communicating with the FBI informant, under the influence of drugs.[7] Not one of Mr. Jalloh's overt acts, or the inspiration therefor, originated with him. While traveling with his father to Sierra Leone, Mr. Jalloh was encouraged to join ISIL, first by a charismatic on-line facilitator, and later by an ISIL collaborator who showed him propaganda videos and pressured him to travel to Libya. In a despondent emotional state, Mr. Jalloh boarded a truck bound for Libya but soon regretted that choice and, at the first safe opportunity, disembarked and fled. Likewise, each of the payments he made to people he believed were affiliated with ISIL was at the behest of others who pressured him to prove himself by providing assistance. Although Mr. Jalloh was badly compromised, and the entreaties for financial assistance played into his personal value of being charitable, albeit in this instance in a very misguided way, he nonetheless only blames himself.[8]

Finally, in the months leading up to his arrest, Mr. Jalloh was introduced to CHS1, a confidential informant for the FBI, for the express purpose of meeting a muslim woman to wed. In their ensuing communications, first by text but graduating to phone calls and two meetings, CHS1 pressured Mr. Jalloh to participate in a domestic "operation." CHS1 was older, apparently versed in the Quran, and played upon Mr. Jalloh's desire to please and reluctance to say no. Eventually, however, when Mr. Jalloh told CHS1 that he would not agree to commit violence,

---

[7] Mohamed Jalloh let. at 2.
[8] Mohamed Jalloh let. at 1.

CHS1 changed tactics, and suggested the purchase of a weapon. In the ensuing two months CHS1 hounded Mr. Jalloh about this and because Mr. Jalloh did not definitively reject the notion, he left himself open to CHS1's nearly constant entreaties. At several points in their communications, CHS1 acknowledged he was being too demanding and agreed to relent. These instances followed times when Mr. Jalloh did not respond to numerous text messages from CHS1. Ultimately, however, Mr. Jalloh gave ambiguous responses about procuring a weapon and then engaged in half-hearted efforts to purchase one with CHS1's knowledge. In one such instance Mr. Jalloh viewed a AK-47 in North Carolina that he knew was not for sale, and in separate instance went to a gun store without his identification. The day prior to his arrest, Mr. Jalloh purchased an assault weapon, but did so without CHS1's knowledge or any commitment to provide that weapon as part of their communications.

All of this is not to say Mr. Jalloh was duped or tricked. He was not and he did demonstrate at least a cognitive openness to providing assistance, even if he did not fully commit to doing so. Even so, Mr. Jalloh's unwillingness to commit to taking violent action and reluctant involvement evince both a superficial degree of radicalization and a core value that is inconsistent with terrorism. Mr. Jalloh's interactions with ISIL operatives and the FBI informant also demonstrate his gullibility, impressionability, lack of sophistication, and passivity. As he wrote to the court, prior to his two meetings with the FBI informant, Mr. Jalloh would

> get high and after [he] would continue [his] high to ease [his] pain internally that [he] kept bottled up to [him]self. When in reality [he] needed [psychological] help …. Based on the way [the FBI informant] represented himself as a knowledgeable, pious Muslim, [Mr. Jalloh] thought that [he] would be the figure that gave [Mr. Jalloh] direction and help[ed him] but in reality [his] judgement was too foggy to see him for what he was in trying to get [Mr. Jalloh] to do something that was completely against [his own] valuses.[9]

---

[9] Mohamed Jalloh let. at 2.

Despite feeling pushed and even manipulated, Mr. Jalloh does not deny his own culpability and moral failings.

> I think now of how many times when I believed I was seeing truth, my vision was actually obscured by pain and lies. Out of all that pain I did many things that now haunt me and have brought terrible shame on to my family.
> ….
> I am disgusted to think about how easily I was manipulated by ISIL's use of a legitimate human rights crISIL to influence me and advance their truly inhuman goals.[10]

As discussed in the next section, Mr. Jalloh is a bright, capable, hard-working, and kind man who had a promising future prior to his dalliance with extremism. Even so, his crime and related activities are a direct byproduct of his untreated trauma and other emotional problems. While he may be guilty of this offense, he is not a terrorist, and to the extent he advocated violent extremism, those views were superficial and a parroted from things he saw online or heard from people who were actively attempting to push him into radical views. He has renounced them in the strongest terms.

### B. History and Characteristics of the Defendant.

As set forth in the numerous letters, declarations, and reports appended hereto, Mr. Jalloh's offense is a complete aberration and totally out of character. Mr. Jalloh has always been a polite, hard-working, family-oriented man of good character, and the radical views that brought him to send money and make furtive attempts to join ISIL or support its cause were situational and shallow. In keeping with his true values, Mr. Jalloh promptly took responsibility for his crime and began cooperating with authorities, has acknowledged an addiction for the first time, has made amends with his family, and has forcefully renounced ISIL and all violent extremism.

### 1. Childhood trauma.

---

[10] *Id.* at 2-3.

The first years of Mr. Jalloh's life were marked by war, trauma, violence, sexual abuse, and significant cultural and familial dislocation. Mr. Jalloh is the only child born to the polygamous marriage between Abubakar Jalloh and his fourth, and much younger wife, Mariama Jalloh. He is also the last of his father's eight children. After two years living with her husband, Mariama Jalloh fled the marriage, relocating to the United States, leaving her son to be raised by other family members.[11] Mr. Jalloh would never again live with his mother. By the time Mr. Jalloh was five, his biological father and step-mother had also fled Sierra Leone when a coup upended the government, creating chaos. Because of his father's departure, Mr. Jalloh lived with extended family members for several years and during that time was sexually abused by a much older cousin, prior to becoming a refugee at age eight.[12] By every measure, the sexual abuse has been a pervasive influence throughout Mr. Jallohs life and left him "feeling tainted, and deeply inadequate."[13]

During the civil war in Sierra Leone, Mr. Jalloh experienced death first-hand when he discovered his beloved grandmother dead, regularly saw dead bodies, and witnessed war atrocities, including the summary execution of a deaf child who was shot at point-blank range because he did not understand a soldier's commands.[14] As Mr. Jalloh recounted to the court-appointed psychiatrist:

> It was a lot of long walks, two or three days … We slept in these rooms where there were fifty people in one bed – people on top of each other. I saw people die. I saw a deaf kid being shot – I think he was mistaken to be a rebel – he was 12 or 13. My aunt later tried to explain it to me – he was trying to explain, but they didn't really understand. He was shot right in front of me. I remember the bang and the body.

---

[11] Let. from Mariama Jalloh to Hon. Liam O'Grady of 1/19/17, at 1 (this letter is attached as **Exhibit D**).

[12] Saathoff Report at 3, 5; *see also* Let. from Moyatou Moseray to Hon. Liam O'Grady of 1/22/17, at 2.

[13] Let. from Fatmatu Jalloh to Hon. Liam O'Grady of 1/30/17, at 1 (this letter is attached as **Exhibit F**).

[14] Saathoff Report at 4. *See also* let. from Rabiatu Jalloh to Hon. Liam O'Grady of 1/24/17, at 1 ("Mohamed … suffered many terrible things because of the civil war.") (this letter is attached as **Exhibit G**); let. from Ramat Jalloh to Hon. Liam O'Grady of 1/22/17, at 1 ("during the civil war, a period as a refugee," Mohamed "witnessed violence firsthand [and] was repeatedly uprooted") (this letter is attached as **Exhibit H**).

> We were all packed back in the trucks and continued our trip. We got to this place where there were different refugees – like camps. Makeshift tents. The Guinea people were mean, they were wicked, the were not welcoming. The would basically tell us to go back. They would throw stones at us. The kids in Guinea would beat us up every time. I remember on the soccer field, I remember a kid with wounds all over his body grabbed me, and I felt so disgusted. That was not a nice time. That went on for about six months.[15]

Mr. Jalloh's brother, Chernor Jalloh, who is a few years older but closest in age, recalls this incident vividly.

> [T]here was a military coup in Sierra Leone and we all had to run for our dear lives to nearby Guinea. On our travels to Guinea [] we encountered a little boy being shot, we were all taken out of the truck and questioned about our loyalty. At this point we noticed a little boy that did not answer the question. Next thing we experienced was the did that did not respond being shot. We later found out that kid was def and could not speak…. Mohamed was eight years old when this horrible ordeal occurred and I have no idea how that experience affected him.

Although Chernor did not appreciate the impact of this trauma on his younger brother, one immediate effect of this uprooting and violence was that Mohamed essentially starved because of the insufficient amount of food, and developed kwashiorkor, a form of malnutrition that caused a distended belly.[16] Fatmatu Jalloh, who is eight years older than Mr. Jalloh, recognizes her family never spoke about these experiences and thus, never came to grips with devastating effects of the war on her brother. Because her family ignores emotional and psychological pain, they "never addressed how being sexually abused for two years and exposed to war trauma profoundly affected Mohamed's development and psychological state."[17]

After approximately six months as a refugee, Mr. Jalloh was again uprooted and moved to the United States. "[T]his was yet another challenging and foreign environment that was much

---

[15] Saathoff Report at 4.
[16] Saathoff Report at 4 & n.3.
[17] Fatmatu Jalloh let. at 2.

different from the 'normal'" the family had been accustomed to.[18] Within only a few years, Mr. Jalloh's father returned to Sierra Leone and his biological mother was deported.[19] Soon after Mr. Jalloh arrived in the United States, he began to exhibit telltale behavioral signs of the trauma including extreme irrational oubursts, low self-esteem, isolation, and becoming overly impressionable.[20] Even so, no one took any action to address either the trauma or its after effects. In fact, the primary adult in Mr. Jalloh's life, his step-mother shielded herself from her step-son's pain and, therefore, "took no action to treat his suffering".[21]

### 2. Parental abandonment amplifies feelings of isolation.

The departure of Mr. Jalloh's parents "brought back feelings of being rejected" because it reminded him that they "seemed not to want much to do with him from birth." Growing up without his mother and the subsequent abandonment by his father made Mr. Jalloh experience a "sense of rejection" and took a "psychological toll on [his] psche." That feeling of rejection naturally was accompanied by a yearning to belong to something, or somewhere.[22] One of Mr. Jalloh's best friends growing, Chris Torres, recalls the emotionally bleak life his friend lived without his parents: "Mohamed lived in a lower income apartment [and when] I visited his home … [i]t was messy … and no adult supervision. In all the time I spent with Mohamed I never once met his parents. What became clear to me is that Mohamed had virtually no parental guidance in his life."[23]

After his parents abandoned him, Mr. Jalloh was sent to Cleveland to live with his older sister where, it appears, he was either unwanted or his sister was overburdened.[24] While living

---

[18] Chernor Jalloh let. at 2.
[19] *Id.*
[20] Fatmatu Jalloh let. at 2.
[21] Rabiatu Jalloh let. at 1.
[22] Chernor Jalloh let. at 2.
[23] Let. from Chris Torres to Hon. Liam O'Grady of 2/1/17, at 1 (this letter is attached as **Exhibit I**).
[24] Saathoff Report at 6.

with his sister in an inner-city neighborhood where he knew no one, Mr. Jalloh developed an addiction on-line pornography as a crude form of escapism and to sooth his pain, albeit in a most destructive way. This addiction not only deepened his estrangement from his family, and sense of isolation, but created such a conflict whereby he and Chernor were forced to leave.[25] Thus, by his early adolescence Mr. Jalloh had been repeatedly uprooted and abandoned or rejected his actual parents and other parental figures, multiple times, and this pushed him to begin seeking identity and sense of purpose outside his family. The yearning for purpose was observed by many of his friends and family members, and made him uniquely susceptible to being influenced by ISIL recruiters. [26]

### 3. Mr. Jalloh's search for identity and belonging left him gullible and impressionable.

Because of his troubled upbringing, Mr. Jalloh reached adulthood ill-prepared and struggling with the long term effects of untreated trauma. The people who know him best recognize that while he is a sincere, kind, and gentle person, he is also very gullible and easily influenced. Because he was not assertive and lacked a clear direction in life, he could be impulsive, and take bold actions to prove himself or show that he could be decisive.[27] As numerous family members recall, Mr. Jalloh joined the Army National Guard out of an abiding love of the United States, but he was also trying to make the point that he could commit and be decisive. The defense submits that Mr. Jalloh's flirtation with ISIL is more a reflection on his

---

[25] *Id.* at 7.

[26] Fatmatu Jalloh let. at 2 ("He struggled to be assertive, to follow-through, to develop his own identity, and … Mohamend became an impulsive young man with a lack of direction."); Let. from SSG Sherwood Rath Anderson to Hon. Liam O'Grady of 1/31/17, at 2 ("Jalloh …. Seemed like he was looking for something to latch onto and barring that would wander rather aimlessly. I think the VA National Guard gave him that sense of purpose for a period of time.") (this letter is attached as **Exhibit J**); Chris Torres let. at 1 ("he always seemed to be in search of a purpose in life or an identity…. He did not seem to know what to pursue or what direction he wanted to take."

[27] Mohamed Jalloh let. at 2; Fatmatu Jalloh let. at 2; Chris Torres let. at 1.

low self-esteem, a desire to prove himself, and acute stressors than any ideological commitment to extremism.[28]

Mr. Jalloh's susceptibility to influence was particularly acute in matters involving children. Because he had suffered considerably as a child and lived for a time as a refugee, he was vulnerable to appeals that touched the nerve of his unresolved emotional trauma. Starting in his late teens, Mr. Jalloh began making charitable contributions to organizations advocating for children in Africa and at points dreamed of opening an orphanage or creating a non-profit organization dedicated to poor children. According to sister Fatamatu Jalloh, Mr. Jalloh returned from the Mosque one day in tears because the Imam had told the congregation that all they could do was pray for Muslims being slaughtered in Burma.

> Given his own refugee experience, Mohamed wanted to help and was frustrated by the admonition that he was powerless. From that point Mohamed began to regularly donate money to various Muslim causes around the world, as well as sending money to the less fortunate in Sierra Leone. The images in particular of Syrian refugees and their struggles made him revisit his own experience with the Sierra Leonean civil war.

Although Mr. Jalloh had little of his own money, he would always find a way to give to charity. Ramat Jalloh, another older sister recalls that even

> "[i]n his broke state, he has countless times used his money to carry out charitable deeds and has been a regular donor with an online Sadaka Foundation… This generosity is typical of our dad, and I see it in Mohamed. I saws Mohamed giving time and energy to set up a Foundation committed to helping girls in Sierra Leone, and helping out a Professor from the States to distribute barrels of aid in gifts to people in the villages of Sierra Leone.[29]

Mr. Jalloh's charitable spirit, however, was both an expression of his compassion and humility, and a vulnerability to being manipulated that was particularly pronounced due to his gullibility and, later, compromised psychological state. As he recounts in his letter to this Court:

---

[28] Saathoff Report at 16, 19, 21-22, 24-25.
[29] Ramat Jalloh let. at 2.

> In my quest to find a solution I started donating money to different aid organizations in hopes of helping the Syrian people. I had always been charitable to non-violent Muslim causes, but felt inspired to do more and donate more. After that I started to watch online videos of civilians escaping Assad, on the beach shores, and walking long distances took my memory back to when I was a child and civilian in the Sierra Leone War which incited an emotion reaction rather than a rational reaction in me. Unfortunately, I succumbed to the same ISIL online propaganda that is responsible for so many atrocities in the world.[30]

Ultimately, Mr. Jalloh's desire to help victim's of war and sense of powerlessness to make a difference, led him to give money to ISIL operatives when he experienced the most significant personal crisis of his adult life.

### 4. Unaddressed emotional problems and acute distress drove Mr. Jalloh's conduct and made him susceptible to radical ideas.

In 2015, Mr. Jalloh traveled to Sierra Leone with his father who was in poor health and with no intent to stay more than the summer. Over the course of the next few months several unanticipated events altered the trajectory of his life. First, he came into contact with ISIL operatives who sought to radicalize him and encouraged him to travel to Libya. Second, he contracted malaria and was not permitted to return to the United States because of the fear that he might have ebola virus. Third, his longstanding girlfriend, Moyatou Moseray, ended their six-year relationship. Given Mr. Jalloh's pre-existing vulnerabilities, fatalistic outlook, and quest for purpose, these events propelled him into making a myriad of increasingly poor decisions that resulted in the offense conduct. When Mr. Jalloh eventually returned to the United States, he was devastated when Ms. Moseray declined to resume their relationship, and profoundly humiliated when she and her new boyfriend began sending risqué photos and videos.[31] In her letter to the

---

[30] Mohamed Jalloh let. at 1.
[31] Saathoff Report at 16-17.

Court, Ms. Moseray confirms that she sent Mr. Jalloh these photos to make clear she and her new boyfriend "were romantically involved."[32]

Receiving these photos and realizing the relationship was over, caused Mr. Jalloh to feel shattered and humiliated. Mr. Jalloh's response to the overwhelming anger and hurt triggered by his girlfriend's rejection was to begin using hard drugs and to try to arrange a hasty marriage to a Muslim woman.[33] As Mr. Jalloh wrote to the Court: "The pain I felt internally was unbearable, and drugs and alcohol were the only things that took that pain away. I started doing marijuana, coke and mushrooms using one of them at least on a daily basis in order to kill the pain I was in and to fill in the void I felt internally."[34] Reflecting on this period and his poor choices, Mr. Jalloh recognizes that he had fallen

> into a very dark depression that made me even more susceptible to on-line propaganda and eventually I endeavored to try to make a difference. Looking back, I see now that I was completely lost. Where I believed, I was going to do something noble, I now understand that I was confused in my own pain, humiliation, and confusion. I cast my depression as some kind of noble inspiration. In truth, it was complete self-destruction.

Through one of the contacts he made in Sierra Leone, Mr. Jalloh sought to find a Muslim wife to stanch his pain and was introduced to the FBI Informant who claimed to be able to find an suitable spouse. With the intent of becoming betrothed, Mr. Jalloh communicated with the CHS1, who sought to turn the conversation away from marriage and toward terrorism. In a series of communications and meetings, and in what can only be described as "grooming," the CHS1 channeled Mr. Jalloh's emotional devastation toward terrorism. Through a sophisticated bate-and-switch, the CHS1 made a series of commitments to assist Mr. Jalloh to get married – and

---

[32] Let. from Moyatou Moseray to Hon. Liam O'Grady of 1/22/17, at 2 (this letter is attached as **Exhibit K**).
[33] *Id.* at 17.
[34] Mohamed Jalloh let. at 2; *see also* Let. from Emmanuela Flomo to Hon. Liam O'Grady of 1/16/17, at 2 ("Another thing that changed in Mohamed was that he started using drugs. I had never known him to do that but in the spring … he started to use drugs regularly … he was getting high and I could see it was making his emotional issues much worse.") (this letter is attached as **Exhibit L**).

from Mr. Jalloh's perspective, relieve his pain – but then would demand some degree of cooperation in return. Mr. Jalloh first expressed ambivalence about doing any "operation" and then flatly rejected the idea. However, the CHS1 persisted and eventually enlisted Mr. Jalloh to try to find a weapon as the *quid pro quo* for his assistance in finding a bride. According to Mr. Jalloh:

> It was during this time that I met that FBI informant. Prior to meeting with him I would get high and after I would continue my high to ease my pain internally that I kept bottled up to myself. When in reality I needed help at this time. Based on the way he represented himself as a knowledgeable, pious Muslim, I thought the FBI informant would be the figure that gave me direction and help me but in reality my judgment was too foggy to see him for what he was in trying to get me to do something that was completely against my values.[35]

Eventually, acceding to the CHS1's persistent requests and manipulation, Mr. Jalloh inquired about an AK-47 he knew was not for sale, and attempted to purchase a weapon without proper identification. Subsequently, and without telling the CHS1, Mr. Jalloh purchased an AR-15 in Northern Virginia, and was promptly arrested.

Undoubtably Mr. Jalloh's conduct over this period of his life was criminal and potentially dangerous. However, but for the perfect storm of his untreated psychological trauma, personal vulnerabilities, acute distress, and the involvement of compelling authority figures who pressured him to engage in criminal wrongdoing, it would not have happened. Because Mr. Jalloh was cognitively open to radical ideas and some degree of minimal participation, he is responsible for the role he played even if in each instance his actions came at the behest of another's importuning.

### 5. Mr. Jalloh's radical views were very shallow.

---

[35] Mohamed Jalloh let. at 2.

Although Mr. Jalloh was exposed to Anwar Alaki's teachings as early as 2011, his genuine openness to extremist teaching was largely situational and dependent upon the influence of others who exploited to his quest for purpose. During his flirtation with ISIL, Mr. Jalloh developed no lasting relationships with terrorists, spent very little time reading or understanding extremist ideology, and in each instance either played a passive role in the activity, or pulled back before endangering himself or others. As he sits today he possesses no strong emotional or psychological attachment to terroristic organizations or ideology and represents a low risk of recidivism.[36] Essentially, Mr. Jalloh's flirtation with extremist thought was very shallow and quickly surrendered because it is contrary to his lifelong values.

Since his arrest Mr. Jalloh has taken every step conceivable to demonstrate he has renounced ISIL and condemns their actions. He has taken public actions that have real-life consequences – including pleading guilty and cooperating with authorities – as well as private actions to repair the relationships he has injured by committing this offense. In interviews with Dr. Saathoff, his letter to this Court, and in his communications with friends and family, Mr. Jalloh not only emphasized his shame and embarrassment for his offense, but also his moral obligation to his family and to the United States.

### 6. No criminal record or prior history of violence.

As discussed previously, and as set forth in the PSR, Mr. Jalloh has no prior criminal history or history of violence. By all accounts and from multiple sources, Mr. Jalloh is a gentle, peaceful, and passive person. Consistent with Dr. Saathoff's conclusion, there is no evidence that Mr. Jalloh has a history of maintaining of maintaining violence conducive and negative attitudes and, as such, is unlikely to reoffend.[37]

---

[36] Saathoff Report at 23-24.
[37] *Id*. at 18, 20-22

### 7. Good character.

Despite his personal struggles and flirtation with ISIL, Mr. Jalloh is universally viewed in an extremely favorable light and a person of good moral character by the people who know him best. He is kind, generous, respectful, polite, industrious, intelligent, hard-working, considerate, loving, thoughtful, un-bigoted, and sincere. A review of the character letters and records demonstrate his essential good character.[38]

### 8. Profound remorse.

Although touched on above, it warrants a separate mention that Mr. Jalloh feels profound shame and remorse for his crime because of the impact it has had on his family, violated his patriotic ideals, and because he surrendered his moral values. His remorse is shown not only in his acceptance of responsibility and willingness to assist the United States in any way he can, but in the efforts he has undertaken to address his personal problems and make amends with his family. In his letter to this Court, Mr. Jalloh wrote:

> I feel deep regret in having been driven by my emotions rather than my intellect and becoming involved with such an evil organization. I have and have always had deep respect and still have respect for the American people and the American values that I pledged to serve. I reject and deplore terrorism and any groups associated with it, especially ISIL. I hate how I allowed myself to be manipulated and how ISIL manipulates troubled and impressionable people like me with their religious propaganda by appealing to Islamic solidarity and a skewed interpretation of selective verses from the Quran. I feel like a complete idiot for accepting such a superficial and dishonest interpretation of Islam, and for blindly accepting what I was being told. I will make It my life's mission to telling the truth about ISIL and all Islamic terrorists, and to preventing other troubled young men from falling prey to their propaganda like I did. I love the United States of

---

[38] In addition to the multiple letters previously identified, setting out specific descriptions of Mr. Jalloh's favorable character traits, the defense submits the additional letters of the following friends and family Esther Afora, Michael Fornah, Abubakar Jalloh, Alpha Jalloh, Ibrahim Jalloh, Isatu Jalloh, Haja Kamara, Lateef Shodeinde, Ahmed Tejan-Sie, and Sean Whitty, which are included as **Exhibit M.**

America. I have always been grateful to this nation for what it has done for me and my family.[39]

The sincerity of his remorse is beyond dispute and can be measured by both his words and deeds.

### 9. Service in the Virginia Army National Guard.

Mr. Jalloh enlisted in the Virginia Army National Guard in April, 2009, at age 19, out of a patriotic desire to give back to his adopted country. His desire to serve in the military was longstanding - dating to his childhood when he observed soldiers in uniform during the civil war in his native country, Sierra Leone – but reflected his love for the United States and genuine appreciation for the opportunities it afforded him as a naturalized citizen. As Mr. Jalloh explained to in his letter:

> Since I first came to the United States I have loved this country deeply for saving me and my family, and for giving me so many opportunities that I would not have otherwise…. I always felt a desire to give back [so n]ot long after I started college at Old Dominion, I joined the Virginia Army National Guard as a way of contributing and helping protect this great country and see it prosper. Since I was young I had been inspired by seeing soldiers in uniform and believed in the noble purpose of the military. I wanted to be part of that and to give back. I wanted to be a good soldier and make my family proud.[40]

Mr. Jalloh's enlistment in the National Guard was met with stern opposition from many in his family who believed he was too soft, or trying to prove something or show that he was a man.[41] Gradually, however, his family came to see that he enjoyed being in the military and was proud of his service. Mr. Jalloh's military records demonstrate that he served honorably, met or exceeded expectations, received regular advancements, was a good soldier and received an

---

[39] Mohamed Jalloh Let. at 3.
[40] Mohamed Jalloh let. at 2.
[41] *See, e.g.,* Fatmatu Jalloh let. at 2-3 ("Some of us objected to him joining the National Guard"); Rabiatu Jalloh let. at 2 (noting she "expressed strong opposition" when "Mohamed was considering joining the Army National Guard"); Ramat Jalloh let. at 3 (when "Mohamed joined the National Guard … I expressed my opposition because I thought he was too soft"); let. from Juldeh F. Tejan-Sie to Hon. Liam O'Grday of 1/27/17, at 2 ("When he enlisted in the National Guard, even to the full consternation of his famiy, he did it to fulfil his role as a full-fledged American citizen and patriot.") (this letter is attached as **Exhibit N**).

honorable discharge when his six-year commitment ended[42]. Mr. Jalloh's commanding officer, Staff Sergeant Sherwood Rath Anderson, who has made a career in the military and faces potential backlash for making a public statement in support of a person accused of providing material support to an enemy, recalls Mr. Jalloh fondly as one of his "favorite soldiers" because he was funny, never caused problems, was full of potential, and went to great ends "in order to become 'American' in spirit, as well as in body".[43] Mr. Jalloh served in the 237th Engineer Company of the National Guard with Tajh Wallace, who recalled him similarly: "I knew [Mohamed] to be low key … friendly and respectful with verone, and he did what was expected[, he] worked well with others [and] was a team player who helped out …. Mohamed was a hard worker, respectful, and considerate all the time."[44]

During the six years he supervised him, Staff Sergeant Anderson, came to know Mr. Jalloh quite well and was struck by how, despite his positive traits, he never seemed to have "really matured emotionally."[45] Particularly germane to the issues relevant at sentencing, Staff Sergeant Anderson could see Mr. Jalloh "was looking for something to latch onto" to give him a "sense of purpose …. I do know he needed direction. Jalloh was like my 10 year old daughter in that respect; she needs to be told what do do before she will do it. She is not yet able to [] extrapolate both an issue and its solution. That comes with experience and maturity, something that Jalloh lacked."[46]

Although Mr. Jalloh's service in the National Guard is not so distinguished to meet the requirements for a downward departure under USSG § 5H.1.11 - because he did not serve in

---

[42] Mr. Jalloh's Honorable Discharge from the Army National Guard, and certificate of Military Service are attached as **Exhibit O**. The remainder of his military records, totaling over eighty pages, are available upon request.
[43] SSG Anderson let. at 2-3.
[44] Let. from Tajh Wallace to Hon. Liam O'Grady, dated 1/29/17, at 1 (a copy of this letter is attached as **Exhibit P**).
[45] SSG Anderson let. at 2.
[46] *Id.*

combat, achieve high rank, or make the military a career, *see, e.g., United States v. Jager*, 2011 U.S. Dist. LEXIS 21203, *28-31 (D. N.M. 2011) (declining to apply § 5H.1.11 but determining military service warrants a variance) - individually or in combination with his other characteristics, his service strongly supports a downward variance under 18 U.S.C. § 3553(a). *United States v. Gill*, 150 Fed. Appx. 205, 207 (4th Cir. 2005); United *States v. Pipich*, 688 F. Supp. 191, 192 (D. Md. 1988). Moreover, as mentioned previously, Mr. Jalloh's military service is a protective factor that supports the conclusion he poses a very low risk of recidivism under the circumstances. *United States v. Morris*, 2014 U.S. Dist. LEXIS 113074, *33-34 (W.D. Va. 2014) (describing military service and honorable discharge as evidence defendant had "respect for authority and the ability to adhere to discipline," and, therefore, "less likely to reoffend").

### 10.    Consistent employment – strong work ethic.

Since joining the Army National Guard at age 19, Mr. Jalloh has maintained consistent employment in a number of fields, working during the summers in college, and often working multiple jobs simultaneously. Among his former employers – including Walmart, Verizon Wireless, Old Dominion Security, and G4S Secure Solutions - Mr. Jalloh was well liked, and viewed as a positive member of the team. In his most recent position, as a supervisor of security at G4S, Mr. Jalloh scored well on all training tests, handled sensitive data, and was quickly promoted. At Verizon Wireless, Mr. Jalloh's first professional job after graduating college, he worked as a customer sales representative for nearly two years, consistently met sales quotas, and was well-regarded by his coworkers.

Maintaining employment has been one of Mr. Jalloh's consistent and redeeming qualities, and an anchor for his future. Mr. Jalloh's excellent employment history is both a

protective factor[47] in assessing the likelihood of re-offending and a free-standing mitigating factor because it reflects a set of values that prioritizes being productive and industrious. Upon his eventual release, Mr. Jalloh possesses the intellect and social skills to function productively in legal, gainful employment setting with the support of his family and friends.

### 11.     Model inmate – excellent pretrial adjustment.

Mr. Jalloh has been continuously incarcerated at the Alexandria Adult Detention Center since his arrest on July 3, 2016, and during that period he has been a model inmate and complied with jail rules and regulations, evincing a respect for authority. That he has made an excellent adjustment to pretrial detention is born out by Mr. Jalloh's incarceration records[48], reflects that his core character is peaceful, law-abiding, and respectful. Mr. Jalloh's model adjustment is a critical data point in assessing his future behavior, both in prison and upon his release

### 12.     This offense is an aberration.

For all the reasons set forth above, Mr. Jalloh's brief immersion into ISIL extremism is a complete aberration and totally out of character. As such, his actions are neither representative of his true values or something that will be repeated.[49]

### C.     The Seriousness of the Offense, Respect for the Law, and Just Punishment.

Mr. Jalloh's crime is a serious offense that has already carried significant consequences for him and his family. In addition to being removed from his home, being incarcerated pending trial, and facing years in prison, Mr. Jalloh's actions breached a trust with his family, brought unwanted attention and hostility upon them, and has permanently stigmatized himself, his

---

[47] Saathoff Report at 19.
[48] Mr. Jalloh's inmate records from the Alexandria Adult Detention Center are attached as **Exhibit Q**.
[49] Saathoff Report at 28-29.

parents, his siblings, and many other people who knew him.[50] Mr. Jalloh's commission of this crime has also permanently altered what had been a very promising future. Prior to his involvement in this offense, Mr. Jalloh had a continuous history of gainful employment, was respected by his military and civilian colleagues, and no criminal record. Going forward, Mr. Jalloh has undermined his prospects for a career, to have and provide for a family, which is an important cultural and religious priority. Mr. Jalloh is a bright man who, by his own choices, has dramatically altered his future. He will likely be on a permanent "watch list," not be allowed to travel outside the United States, never return to Sierra Leone, and will have immense difficulty ever obtaining employment commensurate with his ability and intellect. These consequences are severe and long lasting.

Mr. Jalloh has acknowledged the seriousness of his offense and respect for the law by admitting and taking responsibility for his crimes, providing immediate and comprehensive cooperation with authorities, and pleading guilty. Through these actions Mr. Jalloh has distinguished himself by showing he is capable of reform, willing to make the right choices even if they have severe consequences, and that he is no danger to society. A just punishment, therefore, should take into account the fact that views he held that led to this offense were shallow and transient, and that his conduct since committing this crime, including renouncing ISIL, shows he is capable of making a meaningful contribution to society. A needlessly long sentence will be ruinous and counterproductive.

### D. Deterrence and Protection of the Public.

For the reasons set forth previously, *see* Point I.B., *supra*, at 3-11, counsel submits that

---

[50] During the investigation of this case, undersigned counsel contacted more than two-dozen individuals, including extended family, friends, college professors, soldiers, and co-workers, who declined to provide a statement and requested that their name not appear in connection with this case due to the nature of his offense. To a person, each witness described Mr. Jalloh in favorable terms as a respectful, kind, non-violent, and engaging man.

Mr. Jalloh's risk to commit future crimes or future acts of terror are infinitesimal. He has taken full responsibility for his actions, accepts that he will be punished, and has fully cooperated with authorities, evincing his respect for the lawful authority of the United States government. His crime is indicative of the convergence of his misunderstanding of Islam, which he readily relinquished, the influence of more sophisticated ISIL operatives, and unaddressed emotional and psychological distress; circumstances that will never arise again. Because he is not a terrorist, a needlessly long sentence will have no further deterrent effect or provide any additional protection to society. *Benkahla,* 501 F.Supp.2d at 759.

**E.    Unwarranted Sentence Disparities.**

Section 3553(a)(6), directs district court judges to be mindful of "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Mr. Jalloh submits that several recent cases, involving individuals who attempted to travel abroad to join a terrorist organization, constitute the most appropriate comparable sentencing outcomes and, therefore, support the sentence requested here.

**1.    *United States v. Conley*, 14-CR-163 (D. Colo. 2014).**

Shannon Maureen Conley pleaded guilt to one count of conspiracy, in violation of 18 U.S.C. § 371, referencing 18 U.S.C. § 2339B, for having provided material support to Al-Qaeda and its affiliates, including ISIL. According to the plea agreement, Ms. Conley met her coconspirator, Yousr Mouelhi on the internet in 2014 and thereafter, discussed their mutual beliefs and support for violent Jihad. After Mouelhi advised Conley that was an active ISIL fighter in Syria, she agreed to travel to Syria to assist. Thereafter, on September 7, 2013, Conley joined the United States Army Explorers (USAE) in order to receive military training in tactics in firearms for the purpose of heling ISIL. On February 7-9, 2013, Conley traveled from

Colorado to Texas to attend the USAE training. On March 29, 2014, Mouelhi purchased Conley an airplane ticket so that she could travel to Turkey. On April 8, 2014, Conley traveled to the Denver International Airport to fly to Turkey, but was apprehended before she could board the plan. *United States v. Conley*, 14-CR-163, Plea Agreement (Doc. 37), at 7-9 (D. Colo. Sept. 10, 2014).

When arrested, Conley was in possession of numerous items demonstrating proficiency and certifications of a number of specialized skills, including first aid/nursing certification, U.S.A.E. Certification, National Rifle Association certification and a first aid manual. *Id.* at 9. Agents also recovered DVDs of Anwar Al-Awlaki lectures, books about Al-Qaeda, its affiliates, and jihad, and shooting targets labeled with the number of rounds fired and distances. *Id.* Conley, who was 19 at the time of the crime, pleaded guilty and agreed to provide assistance to the United States. Her initial adjusted offense level was 35, based on the application of the terrorism enhancement. The district court sentenced Conley to 60 months imprisonment. *United States v. Conley*, 14-CR-163, Final Judgment (Doc. 79), at 7 (D. Colo. Jan. 26, 2014).

### 2. *United States v. Wolfe*, 1:14-cr-213 (W.D. Tex. 2014).

Wolfe was charged with and pleaded guilty to one count of providing material support to a designated terrorist in violation of 18 U.S.C. § 2339B, based on his extensive efforts and planning to go to Syria to join ISIL for jihad. This planning included: (1) obtaining new, more durable eye glasses that would hold up on the battlefield; (2) researching airline itineraries to travel to Europe on January 4, 2014; (3) creating a ruse to disguise the actual nature of his travel; (4) planning to raise money to finance the travel; (5) obtaining special certifications for his and his family's birth certificates to facilitate travel; (6) requiring his wife and two undercover officers to watch a video regarding foreign fighters in Syria in preparation for joining the

fighting; (7) raising money to finance travel to Syria; (8) purchasing airline tickets to Dennmark; (9) communicating in codes to disguise his intentions from authorities; (10) obtaining an address in Turkey to send an advance package; and (11) going to the airport in Houston, Texas, to board an international flight with the intent of joining a terrorist organization. *United States v. Michael Todd Wolfe*, 1:14-cr-213, Criminal Complaint, at 2-11 (W.D. Tex. June 6, 2014). During the planning of this trip, Wolfe showed he intended to bring his wife and two young children. Mr. Wolfe, who was 24 years old, pleaded guilty and received a sentence of 82 months.

### 3. *United States v. Thavaraja*, 740 F.3d 253 (2d Cir. 2014).

Pratheepan Thavaraja, a Sri Lankan native, was the principal procurement officer for the Liberation Tigers of Tamil Eelam ("LTTE"), a foreign terrorist organization. He was detained in Indonesia and extradited to the United States in 2007. In June 2009, he pled guilty to conspiracy to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B, and conspiracy to bribe public officials. The district court applied the terrorism enhancement, elevating the defendant's base offense level to 40. Ultimately, although the suggested guideline sentence was 240 months, the district court sentenced him to 108 months imprisonment, a 55% downward variation from the Guidelines range. 740 F.3d at 257.

At the time of his apprehension, Thavaraja was 33 years old, had been engaged in a prolonged pattern of terroristic activity as the chief procurement officer of an entire terrorist organization, and attempted to bribe a public official when caught. In fact, the district court acknowledged that the defendant's "'function [in procuring arms for the LTTE] was critical and involved . . . procurement of deadly merchandise, almost inevitably used to injure, murder, maim, not only military but civilians.'" 740 F.3d at 258. As such, he was not only more deeply involved in a terrorist organization than Mr. Jalloh, but far more morally and criminally culpable.

Despite his crimes, the court found the substantial downward variance was warranted because Thavaraja had no prior criminal record and "taught and worked with other inmates while in pretrial detention to the extent … the district court was convinced he was 'a person of substance and decency.'" 740 F.3d at 260.

4. ***United States v. Warsame*, 651 F. Supp. 2d 978 (D. Minn. 2009).**

In *Warsame*, the defendant – who was born in 1973 - was sentenced to 92 months imprisonment even though he traveled to Afghanistan before September 11, 2011, trained with al-Qai'da, and met and attended lectures by Osama bin Laden, continued to keep in contact with al-Qai'da after he returned to Canada and then moved to the United States. 650 F. Supp. 2d at 979-80. Warsame pleaded guilty to one count of conspiracy to provide material support to a designated foreign terrorist organization under § 2339B, and had the terrorism enhancement applied to his case, resulting in a base offense level of 35, criminal history category of VI, and a sentencing range of 292 to 365 months. Because he had no other criminal history, was not eligible for an enhancement for playing a leadership role or using a minor in the offense, and the government requested a downward variance from 180 to 150 months (defendant requested a sentence of 67 months), the court granted a 49% downward variance. *Id.* at 980-81.

5. ***United States v. Farrokh*, 1:16-cr-20 (E.D.Va. 2016).**

Joseph Farrokh was arrested at the Richmond International Airport as he was boarding a plane to travel to Syria for the stated purpose of joining ISIL as a soldier. By all accounts he had been intensely radicalized by his association with his codefendant, Mohamed Elhassen, and by watching on-line ISIL propaganda. Farrokh, who was twenty-eight at the time of the offense, engaged in elaborate efforts to hid his crime not only from law enforcement, but from his own family, including his wife who was several months pregnant. *United States v.*

*Farrokh*, 1:16-cr-20 (Doc. 30, at 3). Farrokh's extremism grew over a matter of approximately one year as he and his codefendant made several efforts to travel abroad. In addition to swearing an oath of allegiance, agreeing with the beheadings of infidels, stating that he wanted to kill and be killed for Allah, Farrokh agreed to travel to whatever country where he was needed and was willing to kill Americans. In this last regard, Farrokh stated that killing United States Special Forces "is the best." (*Id.* at 7-9.) At sentencing, Judge Trenga granted a significant downward departure under § 3A1.4(b), because the Guidelines significantly overstated the defendant's criminal history, and a significant downward variance under 18 U.S.C. § 3553 thereby reducing the possible sentence from a guideline range of 292 to 365 months to a sentence of 102 months.

6.     *United States v. Amin*, **1:15-cr-164 (E.D.Va. 2015).**

The United States may suggest *United States v. Amin*, is appropriate for comparison, but it is not. By the United State's own account, Mr. Amin was a uniquely sophisticated and influential ISIL recruiter with a long-standing online presence through which he prosthelytized and radicalized "untold numbers of people worldwide", *United States v. Amin*, 1:15-cr-164**,** Doc. 15, at 2, and estimated his more than 7,000 messages reached a group "followers" numbering over 4,000. (Doc. 7, at 2). The United States' evidence showed Mr. Amin had been an active supporter of ISIL for an extended period and had built his online following by regularly providing scholarly support for ISIL and its violent practices and objectives, writing and circulating scholarly articles aimed at creating a "Dark Wallet" revenue stream to provide steady financial support for ISIL, and publishing extensively on a range of other subjects aimed at creating an infrastructure of radical ISIL recruitment. *Id.* at 3-4. The latter category included writings about creating an official ISIL website, advice to jihadists seeking to travel abroad to fight with ISIL, and "highly technical articles … detailing the use of security measures in online

communications to include use of encryption and anonymity software, tools, and techniques".
*Id.* at 4. Finally, the United States proved Amin masterminded Reza Nikenjad's *successful* travel to Syria to join ISIL by using his international contacts to facilitate his travel to Syria through a third country, providing logistical and tactical support to communicate and avoid detection, and taking him to the airport. *Id.* at 5.

In its sentencing memorandum, in which it asked the court to impose a sentence of 15 years, this United States Attorney argued:

> The defendant's offense is notable both for its scope, reaching untold numbers of people worldwide, and for its acute impact on Reza Nikenjad and his family. On the one hand, it is hard to measure the impact on worldwide security the defendant has had through the use of [his] online monikor. The only thing that is certain is that he was a prolific source for support, sophisticated advice, and facilitation, and facilitation of would-be ISIL members all over the world. On the other hand, it is hard to ignore the impact that the defendant's conduct has had on Reza Nikejad (sic) and his parents. This defendant *radicalized* Niknejad and set him on the path to violent jihad. This defendant connected Niknejad with other individuals traveling to Syria to join ISIL. This defendant secured a ride to the airport for Niknejad, provided a thumb drive with a letter and pictures to Niknejad's family on his behalf, and tried to hide Niknejad's plan to join ISIL, by giving a concocted story to investigators looking for Niknejad. There is no question that Niknejad is an adult, who made his own decisions. But there is also no question that this defendant was the single, driving force behind Niknejad's radicalization and desire to fight and die for ISIL.

> The defendant's conduct online and in person was well-considered, sophisticated, and calculated to provide support to ISIL, a group that the defendant well knew was engaged in atrocious violence and terror. These actions were meant to produce results – namely, the provision of soldiers to engage in violent jihad with ISIL. This conduct must be met with a stiff penalty because of its scope and the harm that the defendant caused, both to the immeasurable number of individuals whose stories will never be known, and to Reza Niknejad and his family, for whom this defendant has already written an unhappy ending.

(Doc. 15, at 2-3 (emphasis added).) For his elaborate criminal activity, Amin received a sentence of 136 months. (Doc. 20, at 2.)

In contrast, Mr. Jalloh's crime is defined not by its sophistication, but by the lack thereof, and Mr. Jalloh is not defined by his leadership and mastery of extremist thought, but by his gullibility and status as a follower. Although Mr. Jalloh violated the law, it is apparent that he would not have committed any crime absent the active encouragement of more charismatic, forceful, and sophisticated operatives. And even then, only because of their persistence in pressuring him to prove himself. While Mr. Amin was younger, there was no disputing his level of competence in understanding and articulating jihadist ideology, crafting a compelling message to his adherents, his capacity to radicalize and otherwise encourage others into joining ISIL or adhering to the tenants of its terror, or his ability to coordinate travel. Likewise, Amin possessed a high degree of advanced understanding of the internet and encryption that allowed him to circumvent authorities for an extended period. By any objective measure, Mr. Jalloh is far less culpable, radicalized, and or likely to re-offend.

      **7.**     **Analysis.**

Although there has been a proliferation of terrorism cases over the past decade, those referenced herein are the most applicable for comparison because each defendant was either found guilty of violating § 2339B, or, as in *Conley*, a conspiracy offense that referenced that statute. Each of these defendants eventually pleaded guilty, thereby saving the United States valuable resources, had little or no prior criminal history, and initial base offense levels that exceeded the statutory maximum sentences. The sentences imposed for these similarly situated defendants ranged from 60 months for Conley, to 108 months for **Thavaraja**. For four of these defendants (Conley, Wolfe, Warsame, Farrokh), their primary conduct involved attempting to travel abroad or actually doing so, and each engaged in far more advance planning and/or showed significant sophistication in their criminal activity. For instance, Conley engaged in numerous

training programs to prepare her for war in the year prior to attempting to join, and attained several valuable certifications to make her a more specialized tool for ISIL. Wolfe likewise engaged in an elaborate scheme to travel that involved bringing his whole family, including two young children, raised money to travel, and forced his wife to watch radical videos to prepare her for the war. Both Warsame and **Thavaraja actually succeeded in traveling abroad and joined terrorist organizations and both had leadership positions. Thavaraja used highly sophisticated means to advance the terroristic purpose for a prolonged period of time.**

Mr. Jalloh's conduct can hardly be described as sophisticated. As discussed previously, he is newcomer to extremist ideology and possessed a tepid commitment to taking any action, much less committing a violent act. More importantly, his radical ideals were shallow at best and represent a search for identity and purpose, and the severe emotional reaction he had to ending a longstanding relationship, rather than a deep-seated commitment to violence or jihadist goals. Consideration of the sentencing outcomes for these similarly situated defendants and the need to avoid unwarranted sentence disparities demonstrates a significant downward variance is warranted in this case. To that end, and because he is not in any way a terrorist, Mr. Jalloh requests that he be sentenced to a term of 78 months, **within the sentences imposed for the defendants most similarly situated, Conley and Wolfe.**[51]

---

[51] Mr. Jalloh has not included in his analysis *United States v. Zachary Adam Chesser*, 1:10-cr-395 (E.D.Va. 2010), where this Court imposed a sentence of 120 months for the defendant's conviction for violating 18 U.S.C. § 2339B, because the defendant was convicted of multiple crimes. To the extent *Chesser* is relevant it supports a sentence significantly below 120 months due to the defendant's proactive role as a blogger proseletizing untold numbers of followers, soliciting terrorism, sophistication and degree of radicalization, his solicitation of murder and bomb threats, and his efforts to obstruct justice. *United States v. Chesser*, 1:10-cr-395 (Doc. 32, at 2-14).

### III. IMPOSITION OF A FINE.

Mr. Jalloh requests that no fine be imposed by this Court because, as the Probation Office correctly notes, he "does not have the means to pay a fine or the costs of incarceration and/or supervision." (Doc. 47, at ¶ 48.)

### IV. RECOMMENDATION FOR FACILITY DESIGNATION WITHIN BUREAU OF PRISONS.

After a sentence of imprisonment is imposed the BOP begins the process of designating the offender to a facility for service of the sentence (18 U.S.C. § 3621). The BOP retains exclusive discretion to assign prisoners to any of its facilities, but the Court may specifically make recommendations at sentencing that the BOP will indeed consider. 18 U.S.C. § 3621(4) (A) & (B). Because Mr. Jalloh became dependent on illegal substances, which contributed to his crime and harmed his personal relationships, he respectfully requests that the Court recommend a facility as close to Northern Virginia that provides residential drug treatment for inmates with addictions and a history of substance abuse. Accordingly, if his security level qualifies him, Mr. Jalloh respectfully requests that the Court recommend that he be designated to one of the following institutions: (1) FPC Beckley (WV); (2) FPC Lewisburg (PA); (3) FPC McKean (PA); or (4) FCI, Butner (NC).

### V. COMMUNITY RE-ENTRY AND REHABILITATION.

To maximize Mr. Jalloh's reintegration and transition back to society upon completion of a sentence, the defense requests that the Court include in its order a recommendation that Mr. Jalloh eventually be transitioned back to the community through a Residential Re-Entry Center for the maximum period allowed under the law; preferably one that makes drug treatment available for its clients. The Second Chance Act (through 18 U.S.C. § 3621) authorizes the BOP to transfer inmates to community confinement during the last year of their term, provided they

have demonstrated need for reintegration services. Mr. Jalloh, who became radicalized rapidly, will greatly benefit from the services available in a Residential Re-Entry Center. Such reintegration will be critical to address the issues that led to Mr. Jalloh's incarceration in the first place, and will be key his successful return to the community and reintegration into his family. Mr. Jalloh, therefore, respectfully requests the Court to recommend that he be allowed to serve his final year in a community re-entry program in an approved Re-Entry Center.

## CONCLUSION

For all these reasons, Mr. Jalloh respectfully requests that this Court impose a sentence of 78 months and no fine. Such a sentence is reasonable and just because it is a sufficient punishment but not greater than necessary. Mr. Jalloh also requests the Court include in its sentencing order a recommendation that Mr. Jalloh (1) be assigned to a specified facility that provides residential drug treatment, and (2) be allowed to serve his final year in a community re-entry program in an approved Re-Entry Center.

Respectfully submitted,
Mohamed Bailor Jalloh
By Counsel

_____/s/_____
Joseph T. Flood, VSB #71716
Sheldon, Flood & Haywood, PLC
10621 Jones Street, Suite 301-A
Fairfax, VA  22030
(703) 691-8410
(703) 257-0252 (fax)
jflood@sfhdefense.com

**<u>CERTIFICATE OF SERVICE</u>**

     I HEREBY CERTIFY that on the 2nd day of February, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

     John T. Gibbs
     Brandon Van Grack
     Assistant United States Attorneys
     Attorneys for the United States of America
     United States Attorney's Office
     2100 Jamieson Avenue
     Alexandria, VA 22314
     (703) 299-3775
     (703) 837-8242
     John.Gibbs@usdoj.gov
     Brandon.Van.Grack2@usdoj.gov

                                         _____/s/_____
                                         Joseph T. Flood, VSB #71716
                                       Sheldon, Flood & Haywood, PLC
                                       10621 Jones Street, Suite 301-A
                                       Fairfax, VA  22030
                                       (703) 691-8410
                                       (703) 257-0252 (fax)
                                       jflood@sfhdefense.com