1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
    -vs-                      :    Case No. 1:16-cr-163
                              :
                              :
MOHAMED BAILOR JALLOH,        :
            Defendant.        :
                              :
------------------------------:




SENTENCING HEARING


February 10, 2017


Before:   Liam O'Grady, USDC Judge




<u>APPEARANCES:</u>

John T. Gibbs, Brandon L. Van Grack, and Jolie Zimmerman,
Counsel for the United States

Joseph T. Flood and Fatmatu H. Jalloh, Counsel for Defendant

The Defendant, Mohamed Bailor Jalloh, in person,

2

1            THE CLERK:  1:16-criminal-163, the United States

2    versus Mohamed Bailor Jalloh.

3            MR. FLOOD:  Mohamed Bailor Jalloh.

4            THE CLERK:  Thank you.

5            MR. GIBBS:  Good morning, Your Honor.  John Gibbs,

6    Brandon Van Grack, and Jolie Zimmerman on behalf of the United

7    States.

8            THE COURT:  All right.  Good morning to each of you.

9            MR. FLOOD:  Good morning, Your Honor.  Joseph T.

10   Flood and Fatmatu Jalloh on behalf of Mohamed Jalloh.

11           THE COURT:  All right, good morning.  Good morning to

12   each of you.

13           Good morning, Mr. Jalloh.

14           THE DEFENDANT:  Good morning, sir.

15           THE COURT:  All right.  This comes on for sentencing.

16   Are the parties ready to proceed?

17           MR. GIBBS:  We are, Your Honor.

18           THE COURT:  All right.  Mr. Flood?

19           MR. FLOOD:  We are.

20           THE COURT:  All right.  There have been -- there is

21   one Guideline calculation objection.

22           Mr. Flood, I'll hear anything you would like to say

23   further.  I've read the pleadings, but go ahead.

24           MR. FLOOD:  I think the argument is fairly well laid

25   out in the pleadings, and I think the case law supports the

1   representation that I have made in the pleadings that in order

2   to apply the calculation contained in 2M5.3(b)(1)(E), that

3   there has to be some kind of connection between the money and

4   violent acts.  And the connection can be quite low, the nexus

5   can be quite low.

6         And what we see in this case is that there was never

7   any discussion about the purpose other than instances where he

8   was going to send money for living expenses, for computers and

9   computer equipment, and for travel.  And the travel is a little

10  bit gray, but I don't think, unless it's clear that those

11  people are going to go into battle, I don't think that the

12  enhancement applies.

13        In the cases that we cite, there was either an

14  explicit representation that it was going to be used in one

15  instance for a missile or to support war.

16        THE COURT:  How about the purchase of the AR-15?

17        MR. FLOOD:  My understanding is that this was related

18  to funds that he was mailing.  I think the AR-15 is slightly

19  different.  But again, the AR-15 is sort of a unique part of

20  this because he never discussed the purchase of that weapon

21  with CHS1, the FBI informant in the case.  And it's my belief

22  that it was actually going to be used for something else.

23        I think he was, as we've said in our pleadings,

24  cognitively open.  And that's, obviously, a very dangerous

25  thing, someone who is engaging in this kind of behavior,

4

1   purchasing a weapon, but it's not clear from the facts that he

2   was intending to use that weapon for any --

3           THE COURT:  How about the AK-47 and the North

4   Carolina arrangement, attempting to purchase that?

5           MR. FLOOD:  Again, I don't think that's sending

6   funds.  I think that constitutes an attempt because he was

7   communicating with CHS1 about that purchase, and there was

8   actually sort of coordination going on.  But that's different

9   than providing funds for violent acts.  And I think that's the

10  gist of what we're saying.

11          I think if the position accepted by the Probation

12  Office and the U.S. Attorney's Office is accepted, the

13  violation of the statute where you send funds or attempt to

14  send funds to any terrorist organization, even if it's for a

15  specific non-violent purpose, would violent not only the

16  statute, but would require the enhancement.  I don't think

17  that's possible.

18          It may be that the threshold is quite low, but I

19  don't think it's been met in this case.  And I think in

20  response the Government has essentially said, well, we all know

21  ISIL is bad, and they are committing terrorist acts, and

22  they're a terrorist organization, so when you fund them, you

23  violate this enhancement as well.

24          THE COURT:  Well, all right, let's go to the funding.

25  He meets this recruiter.  He agrees to get on the truck and go

5

1    to the front.  He backs out.  Stays in Africa in contact with

2    this recruiter.  The recruiter says, I've got another group

3    that I'm sending to the front.  And he declines to go on that

4    occasion, but he gives him the money.  Then he hears afterwards

5    that, yes, in fact money was used to assist in getting those

6    recruits up to the -- through the desert into the front.

7              Is that not enough?

8              MR. FLOOD:  Again, I don't think that that's enough.

9    And in some ways it turns on the particulars of this case.

10   What we have here, and I don't want to get too much into my

11   main argument, is we have a guy who is sympathetic to ISIS, but

12   he is badly compromised, and he is being coaxed and they are

13   attempting to radicalize him and persuade him, and he makes a

14   series of sort of halfhearted attempts to do things.  And it's

15   always at the behest of someone else.  And he always sort of

16   backs off eventually on his own because I think he is not a

17   radicalized extremist.

18             In each instance where he is sending money, he is

19   doing it largely to pacify someone to try to prove that he is

20   down with the cause, he supports them, but isn't willing to do

21   something more.

22             And in the context of these conversations, I don't

23   think he really had that intention.  If anything, his intention

24   was to pacify someone who was encouraging him to do something

25   more.  And I don't think he meets the standard for the

6

1    application of this enhancement.

2                THE COURT:  All right.  Thank you, sir.

3            Mr. Gibbs, do you want to respond?

4                MR. GIBBS:  Well, Judge, I think the Court sees it as

5    we do, that the funds that the defendant provided or attempted

6    to provide to ISIL do satisfy the enhancement.  And I want to

7    start with the first one, the one that the Court actually

8    finished with, which is the money to the ISIL facilitator.

9            What is interesting about that, Judge, is in the

10   report of Greg Saathoff, who did the evaluation of the

11   defendant, he quoted some of the things the defendant said

12   about his own attempt to join ISIL.  And the defendant talked

13   about being on that truck traveling across Africa trying to get

14   into ISIL-controlled territory.  And one of things he said was,

15   he said, we were packed like sardines.  I was afraid every

16   second.  This was a 9 out of 10 on a scale of 1 to 10.  My

17   heart was in my throat.  I saw violence.  Guys in the truck

18   would whip people with a hose to pack you in.  This was the

19   worst, most scary situation that I have ever been in as an

20   adult.

21           Now, let's keep in mind, Judge, this was his own

22   attempt to go join ISIL and join them as personnel, as a

23   recruit.  As we know, he didn't follow through on that trip.

24   But after that, the same facilitator who had gotten him onto

25   that truck contacted him and said he had another group, they

7

1    were stuck, they needed money, and that's when the defendant

2    provided the $340.

3          The facilitator later tells him that he had gotten

4    the money and he had gotten the recruits into ISIL-controlled

5    territory.

6          It's hard to look at that evidence and not conclude

7    that the defendant at a minimum had to have reason to believe

8    that money would be used for violence.  Excuse me, Judge.

9          And finally, at the end of this investigation the

10   defendant provided $500 to an FBI undercover who had told him

11   that the money was for the Mujahedin to get them through the

12   borders.

13         And again, that evidence clearly goes to the notion

14   that these are going to be fighters, that these are individuals

15   who are going over to engage in violence.

16         So on that basis, Judge, we would argue that the

17   enhancement clearly applies in this case.

18         THE COURT:  All right, thank you.

19         All right.  I believe the enhancement has been

20   properly included in the Guideline calculation.  I believe that

21   the evidence supports completely that Mr. Jalloh had reason to

22   believe that the money was going to assist in the commission of

23   a violent act.

24         And when we look at the definitions of "material

25   support," it could be money, it could be weapons.  And focusing

8

1   on the money here, as the parties have, clearly that funding to

2   the facilitator/recruiter for the travel for that second group

3   fits within the Guideline definition.

4           So, Mr. Flood, any other objections to the contents

5   of either the Guideline calculation or the presentence report?

6           MR. FLOOD:  Just a small objection.  It's noted in

7   our brief about the circumstances for the termination of his

8   employment.  I have been in touch with G4S, I've gotten his

9   records.  He was terminated because he couldn't return to work.

10  There was never any violation of company policy.  He was in

11  good standing at the time of his arrest.  He had recently been

12  promoted and he was well liked as an employee.

13          And we would just ask that be stricken.  I know we're

14  talking about a prison sentence here and someone charged with

15  this, but at some point it's our hope he will be re-integrated

16  into society and he will go back to work in some capacity.

17          THE COURT:  All right.  That motion will be granted.

18          All right.  Mr. Jalloh, have you gone over the

19  presentence report?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Any other corrections, amendments,

22  additions you seek at this time, sir, to the report?

23          THE DEFENDANT:  No, Your Honor.  Thank you.

24          THE COURT:  All right, thank you.  Then I'll file the

25  report with that one deletion of the termination.  Although it

9

1    is the records that were received by the Probation officer, I

2    find that counsel's further investigation should be credited.

3            The offense level is well beyond the limits of the

4    statutory penalty that applies here.  The Total Offense Level

5    is a 37, and results in a Guideline range with a Criminal

6    History Category VI for this offense, is far above the 20-year

7    maximum for the material support offense that the defendant has

8    pled guilty to.

9            So as I said, I'll file the report with that one

10   amendment.

11           I have read the parties' submissions, the many

12   letters submitted, the expert report.  And, Mr. Flood, I will

13   hear anything else you would like to say at this time.

14           Do either party have a witness that they wanted to

15   put on this morning?

16           MR. GIBBS:  The Government does not, Your Honor.

17           THE COURT:  All right.

18           MR. FLOOD:  Dr. Saathoff is here and available if the

19   Court wants to hear him.  I think he has provided a very

20   detailed, comprehensive report.  The United States has already

21   cited that in its argument to the Court.  I think it is laid

22   out there.  But he is available if there is some need for --

23           THE COURT:  Yeah, I don't see a need to call him.  So

24   go ahead.

25           MR. FLOOD:  Thank you, Your Honor.

1        As we stated, Mr. Jalloh is before this Court, has

2   admitted his crime, he has taken responsibility even before

3   there were formal charges or he retained counsel.  He made open

4   acknowledgements to FBI officers in extensive interviews.  And

5   even after counsel was involved, he immediately began

6   debriefing, provided information not just about his offense,

7   but information he had about other individuals both in the

8   United States and abroad.

9        He has admitted his crime.  He is taking

10  responsibility.  He understands that he is going to be

11  punished, and he is deeply ashamed and remorseful for what he

12  did.  He feels deep shame because he embarrassed his family and

13  brought dishonor upon his service in the United States Army

14  National Guard.

15       And in a special way, as we sit here today with the

16  discussion of the travel ban, he is a refugee.  And he knows

17  the impact of his behavior on other people coming to this

18  country seeking the dream, and he understands he has put a

19  black mark on that.

20       THE COURT:  Well, let me -- as I work through this

21  case, I've got Mr. Jalloh having volunteered, gone over to

22  Africa to join ISIL, getting on the truck, being scared off the

23  truck from the actions of the recruiters, and then getting in

24  touch with Mr. Sudani, who he learns is very active in ISIL's

25  behalf in several different respects.  And he works with CHS.

11

1   And you characterize those activities as you have, he is

2   coaxed, he is badgered, his real intent is to find a wife.

3          And on the other hand, we have somebody who is

4   actively working with what he believes are ISIL participants in

5   the AK-47.  I'm still unclear as to what he was going to do

6   with the AR-15, but clearly there was a plot afoot to kill

7   servicemen.

8          And at the same time he is investigating these other

9   terrorist acts on his computer, and looking at the guns that

10  were used, making comments about how supportive he is of what

11  they had done.

12         And he stops because he gets arrested.  He doesn't

13  one day say, boy, I'm really -- what happened to me?  You know,

14  I need to change my ways.  I need to reject the ISIL beliefs

15  and come back to being the citizen I was.

16         So I'm grappling with how much was he really coaxed

17  versus how much did he really resist being an active fighter,

18  but wanting to be a participant in providing money, or weapons,

19  or some other support as a willing participant at a secondary

20  level.

21         So I would like you to address that as part of your

22  comments.

23         MR. FLOOD:  Yes, Your Honor.  So at the outset, you

24  stated that he went to Africa to join ISIL, and I just want to

25  correct that.  He went to Africa to accompany his father who

1   was very frail and sick.  And while there, he met people who

2   were radicalized and who were actively recruiting him.

3           And I think it's from sort of that impetus that we

4   see a significant distinction between Mr. Jalloh and virtually

5   all of the other individuals that we're relying upon here.  He

6   was the recruited, not the recruiter.  He was facilitated -- or

7   they were attempting to facilitate him, he was not the

8   facilitator.  He was not the ideologue, the extremist.

9           He was somewhat of a passive receptacle to extremist

10  thought.  And because of his gullibility and his compromised

11  emotional state, I do believe he represents a threat and

12  appropriately was prosecuted for providing material support or

13  attempting to provide that.

14          But when you look at the cases, for example, the ones

15  that the United States has relied upon, you see individuals,

16  and I think is -- there is sort of a dividing line in these

17  prosecutions across the United States.  You have people who are

18  radical extremists.  They have active online presence, and they

19  use that as a platform to reach a wide audience.

20          The United States versus Elfgeeh, who was prosecuted

21  and convicted and sentenced to 278 months, he had a very active

22  online presence through Twitter and Facebook, through WhatsApp,

23  communicating with a large group of people, and was able to

24  reach out, recruit, and facilitate specific individuals who

25  then came into contact with the FBI.

13

1          In every instance here, Mr. Jalloh is the one who is

2    being reached out to.  He is the one who is being connected

3    with.  He was put in touch with CHS1, who began on the impetus

4    that he was going to help him find a wife, and that was their

5    conversation, and over the course of months that they are

6    talking you see a couple things going on.  First, CHS1 is

7    promising to help him in his effort to find a wife, but then he

8    is always back-dooring this thing or this operation.

9          And Mr. Jalloh initially is ambivalent about it or

10   expresses -- he is non-committal, and he is doing that because

11   he wants something, and it is sort of a quid pro quo, and he

12   feels he has to acknowledge that.

13         But eventually the pressure gets very intense and he

14   says, I'm not going to do that.  So CHS1, who is working for

15   the FBI and knows that he hasn't committed a crime at that

16   point, starts a new tack with him, and then it's to buy

17   weapons.

18         And again you see sort of halfhearted gestures or

19   efforts to do something.  He ultimately purchased the gun.  And

20   I think it's important that he doesn't communicate with CHS1

21   about the gun.

22         I believe he was in a very suicidal state.  He was

23   extremely depressed.  He had become detached and isolated, and

24   I think he was going to do self-harm with that gun.

25         THE COURT:  Well, didn't he have a handgun already?

14

1              MR. FLOOD:  He did.

2              THE COURT:  All right.  So this is a rifle?

3              MR. FLOOD:  It is a rifle.

4              THE COURT:  Okay.  And how much time took place --

5     how much time elapsed between the purchase of the gun and when

6     he was arrested?

7              MR. FLOOD:  The following day.

8              THE COURT:  The following day.  All right.  Go ahead.

9              MR. FLOOD:  And I think, Your Honor, you're putting

10    your finger on sort of what is the most troubling about this

11    case.  I don't believe he is a radicalized extremist.  I don't

12    believe that he is a recruiter or a leader.  He is clearly a

13    follower.

14              But it is dangerous when someone is in a compromised

15    states and demonstrates what I would describe as a cognitive

16    openness.  There are points throughout this where he says, no.

17    He gets off the truck, I'm not going to do that.

18              CHS1 is pressing him to take part in an operation.

19    He says, no.

20              When he purchases that weapon, it would be inaccurate

21    to say he wasn't cognitively open, but he wasn't committed.

22    And that is what distinguishes him from Mr. Lutchman, for

23    example, who had a specific plan that he brought on his own

24    initiative.

25              Mr. Jalloh is not an initiator.  He is an absolute

15

1    follower.  Followers can do great harm too, but they don't

2    represent the same kind of existential threat than someone who

3    is being sent into battle or who is a follower.

4         In the Amin case, he didn't go overseas, but he did

5    facilitate someone.  And he had been radicalizing and was

6    viewed as a leader within the terrorist community for a long

7    time.

8         And I think that's the gist of our argument here

9    today.  And when you look at the different cases, the way these

10   are treated, both in terms of the ultimate sentencing, but also

11   in terms of the application of downward departures, that is a

12   pretty bright line distinction that's being made by the courts.

13        And I'll just refer then to that departure that we're

14   asking for under USSG section 4A1.3 where the Court has

15   authority, has discretion to apply a downward departure if the

16   Criminal History Category substantially overrepresents the

17   offender's actual criminal history or the likelihood that he

18   would commit other crimes in the future.

19        We recognize, even without the application of the

20   enhancement for sending funds, that Mr. Jalloh's Sentencing

21   Guidelines are beyond the statutory maximum.  So we're not

22   really debating that.

23        What we are arguing though is that he should be

24   treated differently than the hardcore, radical extremists who

25   represent a much greater existential threat.  They can't do

16

1   anything, I suppose, without people who are willing to

2   participate, but they are a much greater threat.

3          So the two factors that the Court can consider in

4   assessing whether or not the Criminal History Category of VI

5   substantially overrepresents his actually criminal history or

6   the likelihood that he will commit offenses in the future, we

7   have provided significant argument and evidence, reliable

8   evidence that suggests both of those two are true.

9          Mr. Jalloh prior to the offense conduct in this case

10  had never previously committed a crime.  He is not a violent

11  person.  He did get training and he served his country

12  honorably in the military.  But outside of that, there is no

13  evidence that he ever took a violent act.

14         Even as a child, there is evidence that when given

15  that opportunity, he would be boastful and show some bravado,

16  but never actually committed violence even as a juvenile.

17         He doesn't have, again, other than the offense

18  conduct, the inclination to commit violence.  And he has the

19  character of a peaceful, law-abiding citizen.

20         We believe that based on his personal characteristics

21  and background, and the influence of others, these crimes are

22  purely situational and dependent upon certain vulnerabilities

23  that he has that arise from traumatic experience and untreated

24  emotional problems.

25         As Judge Cacheris said in <u>Benkahla</u>, a defendant that

1    I would submit was far more sophisticated, committed a lot more

2    crimes, lied about it, denied his responsibility, appealed his

3    crime, for an individual with no criminal record and no

4    evidence of ever having committed an act that was illegal in

5    his life outside the conduct for which he is convicted, this

6    clearly overrepresents the seriousness of his criminal history.

7    And that is the elevation from Criminal History I to Criminal

8    History VI.

9         Likewise in Aref, a man who committed 27 different

10   offenses, his primary involvement was sending sums of money, he

11   was a fundraiser for a terrorist organization.  Again, he

12   denied his offense, he never took responsibility.  He appealed.

13   He was convicted of all 27 offenses, including seven of

14   providing material support.

15        In that case, the Court applied a downward departure

16   under of 4A1.3 because of his background and history.  Like Mr.

17   Jalloh, he had no prior criminal history.  He was looking at

18   what was effectively a life sentence, and the judge granted a

19   downward departure in the criminal history calculation, and he

20   was sentenced to 15 years.

21        Last summer, Joseph Farrokh, a man who was

22   radicalized in the United States and engaged in an eight-month

23   plan to travel abroad and join ISIS, watched online killings

24   and became quickly radicalized, Judge Trenga determined that

25   based on his very limited criminal history, he had two minor

18

1    offenses from almost ten years before, that the reduction was

2    appropriate.

3         Because the application of the terrorism enhancement

4    under USSG 3A1.4 effectively quintuples Mr. Jalloh's Guideline

5    range from about 46 to 60 months to 240, it significantly,

6    dramatically, and unfairly overrepresents his actual criminal

7    history.

8         We would ask the Court under Benkahla, Aref, Farrokh,

9    and the Guideline itself, to treat him as a Criminal History

10   Category I because the application of the terrorism enhancement

11   significantly overrepresents his actual criminal history.

12        Likewise, it substantially overrepresents the

13   likelihood that Mr. Jalloh will ever re-offend.  These are

14   dangerous crimes, they do represent a threat.  We live in a

15   very scary time.  And when you have someone who is shopping for

16   guns at the behest of someone who is representing himself to be

17   affiliated with ISIS, that is a terrifying thing.

18        And I sit here as his representative telling you that

19   as an American citizen, that is very troubling for me.  But he

20   is different as a person, both in terms of his background and

21   history and the situational aspect of this offense.

22        Upon his arrest, he, not like Aref or Benkahla denied

23   what he did or obstructed justice, he promptly admitted what he

24   did.  He took responsibility, pled guilty.  And he avoided a

25   prosecution that would cause the Government to have to prove

19

1    its case.

2         He has expressed genuine remorse not to just his

3    family, but to colleague in his military.  You have letters

4    from two of his associates in the military, one of whom was his

5    commanding officer, who had a six-year baseline to assess his

6    character.

7         I think that while the crime is disturbing, it is out

8    of context and it's aberrational to who he really is.

9         Dr. Saathoff was appointed by the Court, and he did a

10   risk assessment.  He looked at three different aspects of risk.

11   Two are related to sort of violent risk generally.  And the

12   third inquiry goes to the risk of committing offenses in the

13   future that are of a terrorist nature.

14        And the first two, the risk status and the risk

15   state, there are only two elements, one in each, that slightly

16   elevate the chance that he is going to be a recidivist.  And

17   overall for violent crime in general, his risk is very low.

18        And part of the reason for that is that he does

19   respect authority, and he has had excellent institutional

20   adjustment, but he also has a significant amount of family

21   support.  And I represent to the Court that that's important

22   not just because it suggests, you know, the empirical evidence

23   suggests that it makes it less likely that he will re-offend,

24   but I think the crime as well as his attempts to atone for the

25   crime has brought a great deal of awareness to the family, who

1    is here today supporting him, and it has sort of ripped open

2    some old wounds that have never completely healed.  And I think

3    he is doing the hard work to do that.

4            But Dr. Saathoff went further and did an analysis of

5    the likelihood of future risk for violent crime.  And if I can

6    just read briefly from his report:  Based on the validated

7    measures in violence risk assessment, as well as the early

8    terrorism-related research and recidivism, the prospect of Mr.

9    Jalloh's recidivism in areas of terrorism-related activity are

10   significantly decreased related to others who might receive and

11   plead guilty to the same charge.

12           The comparison there is not between Mr. Jalloh and

13   all American citizens.  It's between Mr. Jalloh and other

14   individuals who have been convicted of similar crimes.  His

15   risk is very low.

16           We have presented reliable evidence to demonstrate

17   that the chances of him re-offending in the future are very

18   low.  And, therefore, the application of the terrorism-related

19   enhancement substantially overrepresents the chance that he

20   will offend.

21           For all those reasons, we would ask that the Court

22   treat Mr. Jalloh, before it gets into the 3553 factors, as a

23   Criminal History Category I and then consider the downward

24   variances as requested.

25           I won't belie them, but it's really clear that Mr.

21

1   Jalloh prior to his flirtation was ISIS was sort of living what

2   might be viewed as the American dream.  He came to this

3   country, he served, as is some reflection on his gratitude for

4   that.  But because of his unique background and history, I

5   think that there was unresolved trauma and pain that found its

6   expression in seeking a purpose.  And he doesn't blame any of

7   these individuals for his crime because he takes

8   responsibility, but it is a distinction between him and other

9   people who take the initiative.  He was vulnerable and he was

10  gullible, and he proceeded along these lines and put lives at

11  risk, and he is going to be punished for that.

12          But we would ask the Court to consider the comparable

13  cases where people committed similar crimes and received

14  significant reductions because of similar backgrounds, either

15  the absence of a criminal history or very, very limited

16  criminal history.

17          The fact that the person had a passive role being

18  versus someone who is the leader.  There is no one who knows

19  Mr. Jalloh who would suggest that he is a leader, an initiator,

20  a recruiter, or a facilitator.

21          I think the cases of Benkahla, Thavaraja, and Farrokh

22  are the most representative cases because these are people who

23  tended to take very passive roles, either had no criminal

24  history or very limited criminal history, and received

25  significant reductions.  I should say downward variances.

1          The United States has relied upon sort of two cases,

2    the Elfgeeh case, and has at least mentioned the Lutchman case.

3    Both of those cases are from Western New York.  And just

4    reading the case facts of those, you see the distinction that

5    I'm drawing here.  Those are people who took it upon themselves

6    and initiated either a protracted set of behaviors with a

7    specific plan to murder someone in the case of Lutchman.  Or in

8    Elfgeeh, he had multiple schemes going on, was influencing

9    multiple people, and at one point was helping coordinate

10   communications and logical support for a battle or a siege that

11   was taking place in Syria.

12          And if that wasn't enough, on his own impetus he

13   negotiated and purchased automatic weapons with silencers for

14   the specific reason of killing American enlisted soldiers.

15          As I have noted or as I have represented to the

16   Court, Mr. Jalloh is not radicalized.  To the extent that he

17   was, it was very superficial.  He has renounced his affiliation

18   with ISIS.  And for those reasons, he has distinguished himself

19   from all of these individuals.

20          In Elfgeeh and Lutchman, those individuals were not

21   even eligible for the downward departure because of their

22   background or criminal history.  In the case of Elfgeeh, he

23   actually negotiated a sentence of 270 months because he was

24   looking at so much more time than Mr. Jalloh.

25          For all those reasons, we would ask for the Court to

23

1  determine that Mr. Jalloh is a Criminal History Category I,

2  adjust the sentencing range accordingly, and impose a sentence

3  based on his background and history, the circumstances of the

4  crime, and in particular the identifiable, treatable problems

5  that propelled him into this crime, and the likelihood that he

6  will get the treatment and assistance that he needs.  We

7  believe a sentence of 78 months is sufficient but not greater

8  than necessary to punish him.

9         In our brief we've also requested that the Court,

10  because he's unable to pay for a fine, that the Court impose no

11  fine.

12         And because of his substance abuse history, which was

13  recent, but clearly participated -- you know, there is evidence

14  that he actually was using drugs in order to get up the courage

15  to meet with CHS1 to talk about these things, that the Court

16  recommend a facility where he would be eligible for drug

17  treatment.

18         Thank you, Your Honor.

19         THE COURT:  All right.  Thank you.

20         Mr. Gibbs.

21         MR. GIBBS:  Thank you, Judge.

22         Just a couple of clarifications real quick.  Mr.

23  Flood mentioned about the defendant, and I think he

24  characterized him as cooperating immediately upon his arrest.

25  I do want to clarify that a bit.

24

1          At the time of his arrest, he was interviewed, he did

2     answer questions.  I think the assessment at that time was he

3     was withholding things, he was holding back.

4          So he was not cooperative immediately.  However, he

5     has pled guilty, he has cooperated post -- you know, several

6     months past that.  But I don't think it's accurate to say from

7     the moment he was arrested he was cooperating.

8          The other clarification I want to make is Mr. Flood

9     characterized sort of the entirety of this scheme as a

10    situation where Mr. Jalloh was being reached out to by other

11    people.  I think that overstates it.  And part of the reason

12    for that is that the FBI didn't even get involved and wasn't

13    even aware of Mr. Jalloh until about halfway through his

14    interactions with ISIL.

15         As the Court is aware from the pleadings and the

16    presentence report, the entirety of the time Mr. Jalloh was in

17    Africa, the FBI didn't even know about him.

18         And so, Mr. Jalloh got in contact with the ISIL

19    facilitator, who believed he was a good enough candidate to

20    adjoin ISIL that he put him on a transport to get him to

21    ISIL-controlled territory not once, but twice.

22         And even though Mr. Jalloh decided not to follow

23    through on that particular attempt or those attempts, after

24    going back from the second trip he stayed in touch with the

25    ISIL facilitator.  And that person obviously felt that he was

1  supportive enough that when the facilitator needed help getting

2  another group to ISIL territory, the person he reached out to

3  was Mr. Jalloh.  And he reached out to him to get money to help

4  with that trip, and in fact Mr. Jalloh came through.

5          Also during his time in Africa, Mr. Jalloh got in

6  touch with this individual Sudani, another member of ISIL who

7  was involved in plotting terrorist attacks here in the United

8  States.  And Sudani obviously trusted and felt that Mr. Jalloh

9  was an important enough potential recruit that when Mr. Jalloh

10  returned to the United States, Mr. Sudani reached out to an

11  individual here that Sudani believed was another ISIL

12  supporter.  As it turned out, fortunately, that individual was

13  CHS1, who was working with the FBI.

14          And it was only at that point in the spring of 2016,

15  about eight months after Mr. Jalloh had become involved with

16  ISIL, that the FBI finally learned about his involvement with

17  ISIL.

18          So we had these two individuals, facilitator and

19  Sudani, who obviously saw something in Mr. Jalloh that they

20  felt was committed enough that he could be trusted to join

21  ISIL, to give money to ISIL, to help move recruits, and to help

22  take part in a plot here in the United States which was, as it

23  was explained to Mr. Jalloh, a former member of the Virginia

24  National Guard, a plot to kill military members here in the

25  United States.

26

1          And Mr. Jalloh's response was to talk about the
2    handgun he had bought in February, point to that as evidence of
3    his commitment to a domestic attack, to talk about the Fort
4    Hood shooting, the attacks in Chattanooga as the types of
5    attacks that they should look to that are an admirable type of
6    goal for an attack here in the United States.

7          So it's a difficult case in that we have this
8    individual, Mr. Jalloh, being enamored with ISIL for a lengthy
9    period of time, attempting to provide support for the group in
10   a number of different ways in a number of different places.

11         And this sort of leads to my second point, which is
12   the cases that we cited to and that Mr. Flood cited to, I think
13   it's a very inexact science to try to find analogous cases when
14   you have a fact pattern like this.

15         We've cited to the Elfgeeh case because in that case
16   Mr. Elfgeeh attempted to get people, recruits to go join ISIL.
17   Mr. Jalloh gave money to get recruits into ISIL, and apparently
18   was successful in that.

19         Mr. Elfgeeh attempted to get weapons and silencers
20   for a domestic attack here against members of the military.
21   Mr. Jalloh discussed with the CHS such a plot, and actually
22   probably most chillingly went to North Carolina and attempted
23   to buy an untraceable assault rifle for such an attack.

24         So in our view, Elfgeeh was probably as analogous a
25   case as we could get.  And we recognize, it's not on all fours

27

1    with this case.  And this is such an unusual set of facts, it's

2    hard to come up with an exact case and say, that case has

3    exactly the same facts as this one, here is the sentence that

4    was imposed, and that's the appropriate sentence.  It's not

5    that easy.

6        Benkahla was actually my case.  And in that case

7    Judge Cacheris did impose a 121-month sentence, but in that

8    case it was a false statement case.  He was charged with lying

9    both outside and within the grand jury in a terrorism

10   investigation.  We argued for the terrorism enhancement in that

11   case.  The judge applied it.  He did depart downward in that

12   case, but again it was not a material support case where the

13   plot involved a domestic plot here in the U.S. against members

14   of the military.

15       So I guess what I would urge is just to take any of

16   these cases with a bit of a grain of salt because I am not sure

17   that there is that much guidance in any of them, especially

18   given the fact that none of us have seen the presentence

19   reports in those cases, we don't know the details, aggravating

20   or mitigating factors in those cases.  So it's a difficult

21   exercise.

22       As to the downward departure argument by Mr. Flood,

23   all I can say is that the defense stipulated to the terrorism

24   enhancement in this case.  It was part of the plea agreement.

25   It does call for a Criminal History Category VI.

1          And before this, Mr. Jalloh had absolutely no

2    criminal history, we fully acknowledge that.  But the reality

3    is Congress intended the enhancement to apply in cases like

4    this where it is a terrorism offense and where the requisite

5    intent is met.  And they could have carved out exceptions for

6    individuals with absolutely no criminal history, and they chose

7    not to do that.

8          And I think that's a reflection of the seriousness of

9    these types of offenses.  And certainly in this case, the

10   breadth of the conduct, the length of time of the conduct, and

11   the troubling nature of the conduct -- and ultimately I think

12   that's what it comes down to.

13         I don't quibble with Mr. Flood's characterization

14   that Mr. Jalloh probably is and was a very troubled individual

15   and was in a very bad place, but individuals like that often

16   resort to dramatic violence and do awful things.

17         And so, as the Court correctly noted, when this crime

18   was stopped, it was stopped only because Mr. Jalloh purchased

19   that assault rifle in July and was subsequently arrested the

20   next day.  But given the sort of the history of this case and

21   the way -- you know, there were so many road signs along the

22   way where Mr. Jalloh, having stepped back from his commitment

23   to ISIL, could have walked away from it and could have made a

24   decision that this was just truly not for him.  Getting off the

25   trucks in Africa, coming back to the United States, being

1  pushed by the CHS, there were many instances where he could

2  have stepped away.

3          And what is troubling in this case and makes it a

4  very difficult case is he never did that.  And in fact, in the

5  last days before his arrest, he had tried to buy one rifle,

6  went ahead and purchased a second one, and was conducting these

7  Internet searches that Your Honor alluded to about the Orlando

8  shooter and types of weapons used in terrorist attacks.

9          From the FBI's perspective, it's very difficult to

10 know what to do with that.  And they can't afford to be wrong

11 in a case like that.  And obviously arresting this individual

12 was the appropriate thing to do, but it leaves all of us very

13 troubled given sort of the things he was doing, the things he

14 was saying, the things he was talking about.

15         And so, we do believe that a sentence of, a very

16 stiff sentence in this case is appropriate.  We recommended the

17 20-year sentence as the Guideline range reflects.

18         And we would also note that if the Court is inclined

19 to downward depart as to criminal history, it doesn't have to

20 be necessarily from a Criminal History Category VI to Criminal

21 History Category I, it could be somewhere within that range.

22 So we would urge that as well.

23         But unless there are any other questions from Your

24 Honor, that really concludes it.

25         THE COURT:  Well, I am interested in -- Mr. Flood

30

1    characterized the interaction between Mr. Jalloh and CHS1 as

2    being one where Mr. Jalloh was coaxed, I don't think he used

3    the word "badgered," but clearly was being pushed and that he

4    continued to speak with CHS1 and continue discussing the plot

5    to murder servicemen really because he was still interested in

6    the matrimony issue, and that otherwise he probably would have

7    disengaged.

8            I know you have listened to, I am sure, the actual

9    conversations, which I am sure were taped, so how would you

10   categorize that?

11           MR. GIBBS:  Your Honor, I think certainly the

12   matrimony piece was in there and there were discussions about

13   that, there is no question about that, there is no denying

14   that.  And, honestly, Judge, I think at times the CHS, in all

15   honesty, was more pushy than I would have preferred.

16           Having said all that, Judge, though, it is important

17   to realize that there were only two face-to-face meetings with

18   the defendant and CHS1.  And a lot of what we've put in our

19   pleadings, discussions of the Fort Hood attack, the Chattanooga

20   attack, defendant stating that he had bought that gun in

21   February which the FBI didn't even know about, and sort of

22   pointing to that as evidence of how committed he was to a

23   domestic attack, CHS didn't push him into that because he

24   volunteered that information.

25           So I think to characterize this as simply an

31

1    overzealous CHS that pushed too hard, I think is not accurate.

2    Especially given the fact that the individual in North Carolina

3    that the defendant tried to buy the gun from, this was somebody

4    unknown to the CHS, he didn't know how to get in contact with

5    that person.

6            Mr. Jalloh went down there on his own, drove to the

7    Charlotte area, spent several hours down there, went and looked

8    at the gun, made an offer for it, and informed the CHS that he

9    had seen a gun, tried to buy it, was unsuccessful, but if the

10   CHS would be patient, he would get him a good one.

11           So, you know, even if there were instances where --

12   if it had been up to me, I would have preferred the CHS not to

13   be quite -- to not push quite as hard.  I think it's a great

14   overcharactersization to say that somehow this was driven by

15   the CHS, especially given the fact that Mr. Jalloh had been

16   involved in trying to provide material support to ISIL for

17   probably eight months before he ever met the CHS.

18           And as Mr. Flood correctly points out, he went and

19   bought the AR-15 in July without talking to the CHS about it.

20   And again, the CHS didn't know about that.

21           And he did these Internet searches about the Orlando

22   shooting and things like that, but didn't discuss those with

23   the CHS either.

24           So I think to sort of characterize this as a sting

25   operation that was driven by the CHS, is overstating things.

32

1          THE COURT:  How about the contact with Sudani?  And

2     that was outside of the -- that was before the FBI got involved

3     as well; is that correct?

4          MR. GIBBS:  That is correct, Judge.  So Sudani was --

5     you know, he was based overseas.  He was a -- sort of his role

6     within ISIL, as we understand it, is trying to orchestra a

7     domestic plot here in the U.S.

8          So this is probably one of the more unusual FBI

9     investigations.  I'm not sure you'll see a case like this where

10    you have a CHS here in the U.S. who is contacted by a real ISIL

11    member overseas, who essentially says to him, hey, I want you

12    to work on conducting a plot in the U.S.  And, oh, by the way,

13    there is this guy in Virginia, reach out to him, he is a good

14    brother, he can help you so you, two guys get together and plan

15    this thing out.  And lo and behold, the good brother in

16    Virginia is Mohamed Jalloh.

17         So the Sudani piece was entirely not driven by the

18    FBI because, again, they didn't even know about him until he

19    reaches out to the CHS, or at least they didn't know about his

20    role with Jalloh and they didn't know about Jalloh either.

21         So there is no question, Judge, that this is -- and

22    again, this goes back to why it's a difficult case to sort of

23    analogize to other cases.  It is so unusual to have someone who

24    has got these ISIL connections overseas, who has given money,

25    who has attempted to join, who has come back and wants to take

33

1  part in a plot here in the U.S., and actually the reason he

2  gets involved in the plot is because a real ISIL person puts

3  him in touch with somebody he thinks is another ISIL person

4  here in the U.S.  And fortunately for everyone, it turned out

5  that that was an FBI source.

6          THE COURT:  Thank you, Mr. Gibbs.

7          MR. GIBBS:  Thank you.

8          MR. FLOOD:  A few points I want to state in rebuttal,

9  and I will go in reverse order.

10          Mr. Jalloh was in touch with Sudani, but he was

11  unaware that Sudani was in touch with CHS1.  And all the

12  conversations related to the plot discussed between Sudani and

13  CHS1, Mr. Jalloh was not privy to them.  He continued to

14  contact and communicate with Sudani because he was trying to

15  find a bride.

16          It's clear that that was not a solution to his

17  problems, and he continued to engage in threatening, dangerous

18  behavior, but that was the impetus.

19          THE COURT:  But he learns that what Sudani is up to

20  and what he wants from CHS1 as well as Jalloh is a domestic

21  terrorist act.  He doesn't learn it from Sudani, but he learns

22  it through CHS1, right?

23          MR. FLOOD:  That's right.  And the idea that he is

24  such a good brother and that Sudani has sort of groomed him to

25  be this terrorist, if he was such a good guy to do this, there

34

1  was no discussion between him and Sudani about a terrorist

2  activity, a domestic terrorist activity.  That was engendered

3  between Sudani and CHS1.  And CHS1 immediately starts down that

4  road.  Mr. Jalloh gets in touch with him to talk about a wife,

5  and CHS1 suggests he can help with that, but what about this

6  over here, what about this, what about this.

7          And what I think, these are troubling comments,

8  talking about Nidal Hasan is a troubling thing?  Talking about

9  Chattanooga is a troubling thing.

10         But in all honesty, Your Honor, that's bravado.  He

11 has a gun.  Okay.  At any point he could have given his handgun

12 to CHS1.  And he didn't do that.  He had that weapon for five

13 months and he never offered it, he never said it could be used,

14 he never gave it to him.

15         He talked about it to sort of prove, you know, the

16 purity and the piety, but it wasn't real, it was very hollow

17 and it was artificial.

18         The United States talks about the Charlotte trip.  He

19 did go on a trip to Charlotte, North Carolina, but that was a

20 pre-planned family trip, and the going to look at weapons was

21 sort of a sidelight that was, again, encouraged by CHS1.  Mr.

22 Jalloh said he would do that, and he had did it, but it was

23 really sort of a half-baked, halfhearted effort to do that.

24         And I think it's sufficient to constitute an attempt,

25 and that's why he has pled guilty, but again I think what

35

1    you're seeing is a hesitation and a lack of commitment to

2    actually following through.

3            Mr. Gibbs talked about Benkahla and Elfgeeh and sort

4    of distinguishes Benkahla because it wasn't a material support.

5    But Benkahla traveled overseas and he engaged in training.  And

6    there really was no serious question that he was radicalized at

7    the time and engaged in that training for the specific purpose

8    of joining a terrorist organization.  Subsequently he gets

9    prosecuted for that, and he is found not guilty.  And then he

10   is prosecuted for perjuring himself and lied about that the

11   whole time, was found guilty, and still never apologized or

12   took responsibility.

13           Likewise, there is this sort of emphasis in Elfgeeh

14   about the guns and silencers.  He was actually not found guilty

15   of that.  That was like almost a secondary aspect of the much

16   broader impact that he was having on people in Rochester, New

17   York and overseas.

18           To put those two people in the same boat, it removes

19   all distinctions in these cases, and everyone would get a

20   maximum sentence if that's somehow an appropriate punishment.

21           And then the last thing, sort of the first thing Mr.

22   Gibbs started out with, I've never heard that he didn't

23   cooperate fully.  That's the first time I've heard that today.

24   And if that's true, it's true, but no one has represented that

25   to me.  And every time that he was debriefed, I have been told

36

1    he is being forthright, he is being open.  You know, there are

2    numerous times where he is erring on the side of providing

3    information that they didn't even seem to want.

4           And it would have been, I would think, more helpful

5    to know that if that is actually true much earlier in the

6    process.

7           THE COURT:  Probably 85 percent of the defendants who

8    come into this court have not been completely truthful the

9    first time that they have spoken to law enforcement.  So I

10   don't hold any negative impression from that.

11          MR. FLOOD:  When he did meet with them, they didn't

12   ask him about what was happening in the United States.  They

13   asked him about what was happening overseas.  And he gave a

14   pretty detailed, lengthy account of that.  So much so that

15   later debriefings didn't need to have to be as exhaustive.

16          I just have never heard that before, and it is so

17   sort of hard for me to sit here and explain that.  But I do

18   think he has been very candid, with almost no benefit.  He has

19   implicated himself, and at every turn he's done what the law

20   asks of people to atone for the horrible thing he did.

21          He has admitted his crime, he is taking

22   responsibility.  He is doing everything he can to heal and

23   repair the relationship with the family.  He has had to own up

24   to people who looked up to him or thought of him in a good way

25   and he has disappointed them.  And he is trying to work his way

37

1    back to being the good citizen that he can be.

2           And we would ask the Court to take all that into

3    account in determining whether the downward departure and any

4    variance is appropriate.

5           Thank you, Your Honor.

6           THE COURT:  Thank you, Mr. Flood.

7           Mr. Jalloh, please come to the podium.  This is your

8    opportunity to tell me anything you would like to before I

9    sentence you.

10           THE DEFENDANT:  Thank you, Your Honor.

11           First of all, I want to say I've made a lot of

12   mistakes in my life, but this mistake of giving any support to

13   the violent and extreme organization ISIS has been the most

14   devastating one I have ever decided to make in my life.

15           I definitely renounce and denounce every action that

16   they have taken and anything that they've done.  I do not want

17   to be associated.  And I am deeply, deeply, deeply sorry to

18   this Court, I'm sorry to the American military, I'm sorry to

19   the people of the United States, I'm very, very sorry for what

20   I have done.  I did not intend to cause any harm to anyone.

21           And I want to say -- I want to say, every time I see

22   any atrocities that ISIS commits, I am disgusted by it because

23   I know this is not what I want to be a part of.

24           And part of my ambivalence or whatever is just me not

25   knowing what to do.  I've just -- I was in a really bad place,

38

1    looking for some purpose, and it just really all got out of

2    hand.

3            And most of all, I want to say my proudest moments of

4    my life was serving and being a member of the Army National

5    Guard as a combat engineer with the best unit here in Virginia.

6    And the men that I served with, they have shown their true --

7    their character.  And I am deeply, deeply, deeply ashamed and I

8    am sorry to the men and women of this country that serve and

9    protect us.

10            I do not espouse those views.  In trying to show how

11    I feel, I was trying to espouse those views and trying to be

12    impressive.  That's not my true belief about any of the men and

13    women who serve our country.

14            And at the time of this offense, Your Honor, I was

15    going through deep emotional pain, and it left me lost and

16    purposeless, and I just want you to know that.

17            THE COURT:  What were you going to do with the AR-15?

18            THE DEFENDANT:  Your Honor, to be honest, I purchased

19    this AR-15 out of having a conversation with a man at my job

20    who was repeatedly telling me about he owned a Stag Arms.  And

21    I was working with some Marines, they were showing me some

22    other weapons which they had purchased.  And I really just

23    bought it out of that camaraderie of the people that I work --

24    I work for G4S, all the men I worked with were all ex-military,

25    they were all telling me about they have this, they have that.

39

1  I just happened to buy this in behest of the conversations that

2  I was having.

3          But to be honest, Your Honor, I had no intentions or

4  no plans with that weapon.

5          THE COURT:  All right, go ahead.

6          THE DEFENDANT:  And I just want you to know that this

7  entire crime is not who I am, it's not who I plan to be, and

8  it's not who I have been.

9          And I want to say sorry also to my family.  I know I

10  have caused them a lot of devastation and shock, especially my

11  ailing father.

12          And lastly, Your Honor, I want to say to the

13  Government, the reason why I've tried to give them every bit of

14  information that I have in my head, every bit in the recesses

15  of my head to make sure they can be able to investigate and do

16  their job best is because I want to show that I am not

17  affiliated with that group, I do not support them, I do not

18  want anything to do with it.

19          And I am sorry for my actions, I am sorry for my

20  behavior, and I ask the Court for a second chance.

21          Thank you.

22          THE COURT:  All right, please stay there.  You had a

23  terrible upbringing, and you were able to overcome that and

24  come here and become a naturalized citizen, and go to college,

25  and work, and join the National Guard.

40

1          And then you took a 90-degree turn and radicalized
2   very quickly.  And while in Africa you decided to join ISIL and
3   go fight on the front lines against the United States and
4   others, and continued to support them after you decided not to
5   go to the front lines by providing them with money.
6          You knew that Sudani was trying to hatch a plan to
7   kill servicemen here in the United States, you supported that.
8   You went actively looking for that AK-47.  You spent a
9   significant amount of time reviewing the actions of other
10  terrorists here in the United States and how they had been
11  successful, and expressed admiration for their work in killing
12  people that they had done.  And you stopped when you got caught
13  and you were arrested.
14         And so, what I looked for in this case was whether --
15  or one of the things I looked for was did you try and -- did
16  you come to your senses on your own?  Did you need to be
17  arrested first?  And it's clear from the evidence that you
18  stopped because you got arrested.  And it's unclear exactly
19  where you were going, but you never ceased to support ISIL
20  until you were arrested.
21         I am not going to downward depart under 3A1.4.  I
22  find that you entered into a plea negotiation, and clearly the
23  actions that you took merit the 12-point enhancement.
24         And as Mr. Gibbs stated, Congress decided that this
25  type of crime advanced Criminal History Category I to a

41

1    Criminal History Category VI because of the nature of the

2    offense itself.  And I don't believe that it's proper as a

3    result for the Courts to look outside of that legislative

4    action in reducing the Criminal History Category.

5            But I do think that the arguments fit well within the

6    Court's authority to vary downward under the 3553 factors in

7    looking at the nature of the offense and also looking at the

8    need to deter you from future violent crimes.  You have no

9    criminal history, and you have been a law-abiding citizen and a

10   member of the National Guard.

11           So I think that the ultimate sentence that I hand

12   down should reflect the good things you have done as well as

13   the horrendous things.

14           But the offense here, as Mr. Gibbs has stated, is

15   really troubling because you were willing to take significant

16   steps to support ISIL even though you had spent six years in

17   the National Guard.  And that is so hard to really understand

18   in looking at your background.

19           And as a result, it merits a very significant

20   sentence to deter others because of the nature of the offense

21   itself, and the purpose of the domestic terrorist act here and

22   the things that you did to further that.

23           I am going to sentence you to 132 months of

24   incarceration.  Five years of supervised release.  A $100

25   special assessment.  I will not impose a fine or costs because

42

1    I find that you are unable to afford them.

2            I will order as special conditions of supervised

3    release that you are barred from associating or communicating

4    with any terrorist organization.

5            That you participate in a program for substance abuse

6    testing and treatment as directed by the Probation Office.

7    Also for mental health treatment by the Probation Office.

8            That you comply with the requirements of a computer

9    monitoring program that will be put in place.

10           I will give you credit for time served awaiting

11   sentencing since your arrest.

12           I will ask that you be designated to one of the

13   facilities that your counsel has requested.

14           I will ask that you be evaluated for the residential

15   drug program.  And also the re-entry program at the end of your

16   sentence.

17           Anything else?

18           MR. FLOOD:  Not from us, Your Honor.  Thank you.

19           MR. GIBBS:  Not from the Government, Judge.  Thank

20   you.

21           THE COURT:  All right.  Thank you, counsel.

22   -------------------------------------------------
                        HEARING CONCLUDED

23
             I certify that the foregoing is a true and
24      accurate transcription of my stenographic notes.

25                      /s/  Norman B. Linnell
                     _____
                     Norman B. Linnell, RPR, CM, VCE, FCRR